843 F.2d 111
 James S. GREGORY, Appellant,
v.
Mark CHEHI, Barry Gebhart, William Danyluk, Dennis Benner,
Everett Oren, Guy Lesser, Stephen J. Marcincin,
and Lower Saucon Township, Appellees.
 No. 87-1222.
 United States Court of Appeals,
Third Circuit.
 Argued Oct. 8, 1987.
Decided March 24, 1988.
Rehearing and Rehearing In Banc
Denied April 25, 1988.
 
 James T. Huber (argued), Allentown, Pa., for appellant.
 Christine M. Mooney (argued), Charles W. Craven, Marshall, Dennehey, Warner, Coleman and Goggin, Philadelphia, Pa., for appellees.
 Before WEIS and STAPLETON, Circuit Judges, and DIAMOND,* District Judge.
 OPINION OF THE COURT
 WEIS, Circuit Judge.
 
 
 1
 The doctrine of res judicata has never been as pithily or colorfully expressed as it was during the Civil War by a highly unlikely source. General Nathan Bedford Forrest, the semi-literate cavalry genius of the Confederacy, after twice refusing a soldier's request for a furlough, scribbled on the back of the form, "I told you twicest Godamnit know."[1] We take somewhat longer to explain why the adverse result of a state proceeding instituted by a police officer to protest his dismissal prevents him from relitigating part of his case in a section 1983 action in federal court. Because some elements of the plaintiff's case fall outside claim preclusion limits, we will affirm in part and vacate in part the summary judgment in favor of defendants.
 
 
 2
 On November 1, 1985, after nine and one-half years of service as a police officer for the Township of Lower Saucon, Pennsylvania, plaintiff was discharged from his position, assertedly for violations of departmental rules. Plaintiff then demanded and received a hearing before the Township Council pursuant to the Local Agency Law, 2 Pa.Cons.Stat.Ann. Sec. 752 (Purdon Supp.1987), and the Police Tenure Act, 53 Pa.Stat.Ann. tit. Sec. 811 (Purdon 1974).[2]
 
 
 3
 Council received evidence showing that plaintiff (1) left his patrol duty on the night of October 25, 1985 without justification and spent more than two hours at his home; (2) improperly reported his whereabouts during that time period; (3) responded falsely and evasively to questions by the police chief and the township manager about his activities that night; and (4) had received five written warnings for improper conduct during the preceding four years. Citing those factual findings, Council sustained the plaintiff's discharge.
 
 
 4
 The hearings required three public sessions of Council, during which the parties were represented by attorneys who examined and cross-examined witnesses at length. A court reporter prepared a complete transcript of the hearings. The hearing panel consisted of three Council members: Barry Gebhart, William Danyluk, and Everett Oren. Five members usually sat on the Council, but in this instance Mayor Mark Chehi and Councilman Dennis Benner recused themselves as adjudicators in order to testify as fact witnesses. Although plaintiff moved to disqualify Danyluk for political bias, the councilman asserted his objectivity and refused to step aside.
 
 
 5
 Testimony established that, for about four years, plaintiff had actively participated in politics in Lower Saucon Township and in his neighboring hometown, the Borough of Hallertown. In both communities, he held executive positions in the Democratic Party; in Hallertown, he also served as a councilman.
 
 
 6
 The plaintiff's political activities frequently spawned controversy. In 1983, as a Democratic Executive Board member, plaintiff tried unsuccessfully to block party endorsement of Danyluk's candidacy for the Township Council. In 1984 and 1985, when plaintiff represented the Township Police Association at Council meetings, he publicly criticized the way in which the Township administered the police department.
 
 
 7
 Gail Nolf, a witness at the plaintiff's hearing who had held various Township posts, testified to political animus on the part of the defendants. She spoke of having told defendant Chehi in 1985 that plaintiff might support Nolf's bid for a council seat. Mayor Chehi responded, "[H]e shouldn't be messing in politics," that "being a Policeman, he shouldn't get involved in politics," and "they could nail him on that." Nolf also averred that Danyluk said he "wanted to get that bastard."
 
 
 8
 In their summations to Council, lawyers for plaintiff and the Township addressed the charges of misconduct and called attention to the allegations of bias. The plaintiff's attorney conceded that his client might have committed a technical violation of police regulations, but argued that a written reprimand would suffice. Observing that the Council's decision to terminate plaintiff bypassed appropriate procedures and could be attributed to improper motivations, his counsel warned, "you may not like his politics and you may not like his outspokenness, but I think you also are going to take your responsibility seriously and know that you are dealing with someone's livelihood."
 
 
 9
 The Township's attorney responded, "there is one thing that [plaintiff's counsel] has said I agree with--I don't think this Board [Council] should consider any public political statements made by Mr. Gregory in rendering their decision." He urged the Councilmen to "purge any such statements from your mind" and "consider only the evidence that we have presented concerning his conduct as a Police Officer...." The attorney then concluded: "Forget politics. Forget his public statements. They are not important in your decision."
 
 
 10
 Following Council's unfavorable resolution of his petition, plaintiff appealed to the Court of Common Pleas of Northampton County as provided by the Police Tenure Act and the Local Agency Law. He named as defendants Lower Saucon Township, as well as Barry Gebhart, William Danyluk and Everett Oren, the Council members who had heard the plaintiff's petition for reinstatement. Although on the appeal to the Court of Common Pleas plaintiff initially sought a de novo hearing, he did not pursue this request and did not present any testimony beyond that contained in the hearing transcript.
 
 
 11
 In his brief to the Common Pleas Court, plaintiff discussed at length the allegations of bias. He referred to Nolf's testimony, recalling Chehi's intention to "nail" plaintiff for his political activity and Danyluk's threat to "get" plaintiff. The brief commented that "[d]espite this evidence, Gregory's motion for Danyluk's removal was denied, and Danyluk sat in judgment of Gregory."
 
 Plaintiff's brief listed five issues:
 
 12
 1. A violation of the "Sunshine Law;"
 
 
 13
 2. The township's failure to follow its progressive discipline policy;
 
 
 14
 3. Insufficiency of the evidence on the plaintiff's false answers;
 
 
 15
 4. Failure to notify plaintiff that his actions would be a basis for discharge;
 
 
 16
 5. "Whether Councilman Danyluk was biased and predisposed to render him incompetent to sit on council to decide whether Officer Gregory should be discharged."
 
 
 17
 In Part D, captioned "The Township Council Members, Particularly William Danyluk, Were Biased Against Gregory," the brief cited section 2 of the Police Tenure Act, which prohibits the removal of an officer for "religious, racial or political reasons." The brief then continued:
 
 
 18
 "It is undisputed that Gregory was enmeshed in politics. His opposition to the key witness against him, Marcincin, and Board Members Benner and Chehi, also key material witnesses against him, were public knowledge and acknowledged by Marcincin, Chehi and Benner. Previous discipline imposed upon Gregory by this Council, which included Benner and Chehi, were obvious attempts to cool Officer Gregory's political activities, as well as infringe upon his constitutional rights to freedom of speech and freedom of association."
 
 
 19
 After alluding to the "witch hunt mentality" of witness Marcincin and Mayor Chehi, plaintiff turned to the "equally biased" Danyluk. The brief urged the court to not allow these three "political cohorts" to prevail, warning that their success "would do violence to not only the Police Tenure Act but also basic concepts of fundamental fairness upon which that Act is based."
 
 
 20
 The Court of Common Pleas delineated its standard of review as "limited to a determination of whether the Board of Supervisors [Council] abused its discretion, committed an error of law, or violated any constitutional rights." After reviewing Council's factual findings, the court concluded that substantial, if not overwhelming, evidence supported the plaintiff's discharge. The court further upheld the procedures Council had followed in sustaining the dismissal.
 
 
 21
 The state court found the plaintiff's allegations of bias to be without merit, reasoning that after the two councilmen who had direct personal knowledge disqualified themselves, the remaining three conducted the hearing fairly, reasonably, and with no preconceived ideas about the plaintiff's guilt or innocence. Having rejected the bias argument, the court emphasized that the Police Tenure Act was designed to prevent the removal of police officers for political or other improper purposes, yet "[i]t did not create or vest some sort of absolute right in errant officers to remain on the job at the expense of the public they are sworn to protect."
 
 
 22
 Plaintiff did not appeal this decision to the state appellate court, but three months later filed suit in the federal court seeking reinstatement and damages for alleged violations of his constitutional rights. In addition to the individual defendants sued in the state court proceeding, the complaint named as defendants Mayor Mark Chehi and Councilman Dennis Benner, Police Chief Guy Lesser, and Stephen J. Marcincin, a district magistrate who had testified against plaintiff.
 
 
 23
 The complaint alleged that the individual defendants conspired to have plaintiff discharged for exercising his First Amendment rights to free speech, belief and association. The pleading also asserted that the Township dismissed plaintiff without adhering to mandated progressive disciplinary procedures, failed to adopt written directives governing police officers on duty, and conducted the hearing in spite of the plaintiff's challenge to Council's impartiality.
 
 
 24
 The district court, 654 F.Supp. 670 granted summary judgment for defendants after finding that the decision to remove plaintiff from the police force had been made by Township Manager Robert I. VanSchaick. Discerning no evidence to support the allegations that defendants conspired with him to arrange the dismissal, the court concluded that any attack on the constitutionality of the removal should be directed toward VanSchaick, not defendants.
 
 
 25
 The district court also held that the plaintiff's due process claim based on the asserted denial of his First Amendment rights was barred by collateral estoppel. As the district judge explained, "[e]ven though the state court did not mention the First Amendment, the opinion of the [Common Pleas] court, the requirements of the Police Tenure Act, and the brief of the plaintiff show that the alleged political bias of the review board was fairly and finally adjudicated by the state court." Because "plaintiff took advantage of his full and fair opportunity to litigate his claim of unconstitutional bias and [because] the state court considered, and rejected, that claim," the district court refused to allow relitigation of the identical issue in the federal action.
 
 
 26
 On appeal, plaintiff contends that the state court considered his political activity only as it affected his claim of bias against Danyluk. Plaintiff argues that he had no obligation to raise substantive First Amendment claims in the state court, and that the issue decided in the Common Pleas action was not identical with the controversy presented to the district court and that he was denied discovery on the conspiracy claim. Defendants, however, insist that "determination of Gregory's First Amendment and bias claims were crucial to the Court of Common Pleas affirmance of Council's decision." Defendants maintain that although plaintiff did not phrase the issue in terms of the First Amendment, the state court considered and rejected the constitutional claim when it resolved Gregory's bias argument.
 
 I.
 
 27
 Res judicata and collateral estoppel are related but independent preclusion concepts. The term res judicata has been given a variety of meanings--from preclusion in its generic sense, to a judgment that bars further litigation on the claim upon which the first suit is based, to an adjudication of an issue contested in the previous action which precludes further litigation of that same matter. A. Vestal, Res Judicata/Preclusion, V-13 to 14 (1969). To reduce the confusion that resulted from the interchangeable use of these terms, the courts have refined the nomenclature used in the preclusion doctrine. Wade v. City of Pittsburgh, 765 F.2d 405, 408 (3d Cir.1985). See generally Trautman, Claim and Issue Preclusion in Civil Litigation in Washington, 60 Wash.L.Rev. 805 (1985).
 
 
 28
 The Supreme Court and the Second Restatement of Judgments use the terms "claim preclusion" and "issue preclusion." See Migra v. Warren City School Dist. Bd. of Educ., 465 U.S. 75, 104 S.Ct. 892, 79 L.Ed.2d 56 (1984). Claim preclusion replaces "res judicata" and encompasses both merger and bar principles in giving dispositive effect in a later action to a prior judgment. Issue preclusion now substitutes for "collateral estoppel." This preclusive device is somewhat more limited than claim preclusion because it bars relitigation only of an issue identical to that adjudicated in the prior action. Restatement (Second) of Judgments ch. 1 (1982).
 
 
 29
 Although sharing the common goals of judicial economy, predictability, and freedom from harassment, see Ginsburg, The Work of Professor Allen Delker Vestal, 70 Iowa L.Rev. 13, 20 (1984), these two concepts may have different consequences. Claim preclusion prevents a party from prevailing on issues he might have but did not assert in the first action. Riverside Memorial Mausoleum, Inc. v. UMET Trust, 581 F.2d 62, 67 (3d Cir.1978); Duquesne Light Co. v. Pittsburgh Rys., 413 Pa. 1, 5, 194 A.2d 319, 321 (1963), cert. denied, 377 U.S. 924, 84 S.Ct. 1221, 12 L.Ed.2d 215 (1964).
 
 
 30
 In issue preclusion cases, however, the earlier judgment forecloses only a matter actually litigated and essential to the decision. The first judgment does not prevent reexamination of issues that might have been, but were not, litigated in the earlier action. Riverside Memorial Mausoleum, 581 F.2d at 69. See also, Restatement (Second) of Judgments Sec. 27 comment a (1982). See also Melikian v. Corradetti, 791 F.2d 274, 277 (3d Cir.1986) (applying New Jersey law).
 
 
 31
 A federal court applying preclusion principles is bound by the Full Faith and Credit statute, 28 U.S.C. Sec. 1738,[3] and must give a prior state judgment the same effect as would the adjudicating state. Davis v. United States Steel Supply, 688 F.2d 166, 170 (3d Cir.1982) (in banc), cert. denied, 460 U.S. 1014, 103 S.Ct. 1256, 75 L.Ed.2d 484 (1983). See generally Smith, Full Faith and Credit and Section 1983: A Reappraisal, 63 N.C.L.Rev. 59-123 (1984). The same results follow in section 1983 suits brought in federal courts. Migra, 465 U.S. at 85, 104 S.Ct. at 898 (claim preclusion); see Allen v. McCurry, 449 U.S. 90, 95, 101 S.Ct. 411, 415, 66 L.Ed.2d 308 (1980) (issue preclusion).
 
 
 32
 The case before us draws in principles of both claim and issue preclusion, and examination of their pertinent elements is helpful in resolving the conflicting positions of the parties. A Pennsylvania court issued the initial judgment here, and so we look primarily to that state's law on preclusion.
 
 II.
 Claim Preclusion
 
 33
 Pennsylvania requires a concurrence of four conditions before claim preclusion can apply. The two actions must share an identity of the (1) thing sued on; (2) cause of action; (3) persons and parties to the action; and (4) quality or capacity of the parties suing or sued. Duquesne Slag Products Co. v. Lench, 490 Pa. 102, 105, 415 A.2d 53, 56 (1980); Bearoff v. Bearoff, 458 Pa. 494, 497, 327 A.2d 72, 74 (1974). See also Harris v. Pernsley, 755 F.2d 338, 342 (3d Cir.), cert. denied, 474 U.S. 965, 106 S.Ct. 331, 88 L.Ed.2d 314 (1985); Davis, 688 F.2d at 170. Although consistent in demanding satisfaction of these four criteria, the state courts have avoided mere technical adherence to mechanical principles. Commonwealth of Pa. Dep't of Transp. v. Mitchell, 535 A.2d 581 (Pa.1987).
 
 A.
 
 34
 Isolating the alleged wrongful act is critical to the first requirement--identity of subject matter. In this case, a single event, the November 1, 1985 discharge, gave rise to both state and federal actions. Because that same occurrence underlies both suits, the first prerequisite of claim preclusion is met.
 
 B.
 
 35
 The second element, identity of cause of action or "claim" requires somewhat more discussion. "Claim" is defined broadly in transactional terms, regardless of the number of substantive theories advanced in the multiple suits by the plaintiff. Restatement (Second) of Judgments Sec. 24, comment a (1982).
 
 
 36
 In Davis, we held that a federal claim under 42 U.S.C. Sec. 1981 was barred by a Pennsylvania court judgment adverse to the claimant in a proceeding brought under a city Human Relations Ordinance. Davis, 688 F.2d at 173 n. 9. In both the state and federal suits, the plaintiff had alleged that her discharge was racially motivated. Although she had succeeded before an administrative agency and the Court of Common Pleas, the state appellate court found insufficient proof of discriminatory treatment and ruled in favor of the defendant.
 
 
 37
 Acknowledging the "conceptual difficulties inherent" in any definition of a cause of action, we applied claim preclusion and barred relitigation. "A single cause of action may comprise claims under a number of different statutory and common law grounds." Davis, 688 F.2d at 171. We declined to rely on a test dependent "on the specific legal theory invoked." Id. Instead, we stated that claim preclusion "generally is thought to turn on the essential similarity of the underlying events giving rise to the various legal claims, although a clear definition of that requisite similarly has proved elusive." Id. See Donegal Steel Foundry Co. v. Accurate Products Co., 516 F.2d 583, 588 n. 10 (3d Cir.1975).
 
 
 38
 The Supreme Court of Pennsylvania applied "res judicata" in Helmig v. Rockwell Mfg. Co., 389 Pa. 21, 131 A.2d 622, cert. denied, 355 U.S. 832, 78 S.Ct. 46, 2 L.Ed.2d 44 (1957), despite the fact that the first suit was brought in assumpsit and the second in trespass for a conspiracy. It was not important that in the second suit plaintiff sought punitive damages in addition to the compensatory recovery claimed in both. The court noted that "the acts complained of in both actions are identical" and predicted that the plaintiff would "inevitably call the same witnesses and present exactly the same evidence in this second action." Id. at 30, 131 A.2d at 626. In such circumstances, the court was required to pierce the technical differences between the two actions, take a broad view of the subject, and bear in mind the actual purpose to be attained. Id. at 30, 131 A.2d at 626-27.
 
 
 39
 The Restatement observes that a claim extinguished by res judicata "includes all rights of the plaintiff to remedies against the defendant with respect to all or any part of the transaction, or series of connected transactions, out of which the action arose." Restatement (Second) of Judgments Sec. 24(1) (1982). In determining what constitutes a "transaction," pragmatic consideration of whether the facts are related in time, space, origin, or motivation is appropriate. Comment c to section 24 emphasizes that "where one act causes a number of harms to, or invades a number of different interests of the same person, there is still but one transaction; a judgment based on the act usually prevents the person from maintaining another action for any of the harms not sued for in the first action."
 
 
 40
 Multiple claims do not arise solely because a number of different legal theories deriving from a specific incident are used to assert liability. The transaction remains unitary "although the several legal theories depend on different shadings of the facts, or would emphasize different elements of the facts, or would call for different measures of liability or different kinds of relief." Id.
 
 
 41
 When a plaintiff relies on both state and federal law, the Restatement advocates claim preclusion, provided that the first court to adjudicate the matter has jurisdiction to entertain the omitted claim. Restatement (Second) of Judgments Sec. 25 (1982). See Kremer v. Chemical Constr. Corp., 456 U.S. 461, 482 n. 22, 102 S.Ct. 1883, 1897 n. 22, 72 L.Ed.2d 262 (1982).
 
 
 42
 Moreover, claim preclusion may not be evaded simply by adding allegations of conspiracy to the very same activity challenged in the first action. In Riverside Memorial Mausoleum, the court held that the plaintiff could not defeat preclusion by asserting a civil conspiracy when the state court had already adjudicated the validity of a claim based on the same activity. Riverside, 581 F.2d at 67. Similarly, in Kauffman v. Moss, 420 F.2d 1270 (3d Cir.), cert. denied, 400 U.S. 846, 91 S.Ct. 93, 27 L.Ed.2d 84 (1970), we concluded that the appellant's later allegation that the appellees conspired to commit perjury would not by itself avoid claim preclusion. As we explained, "if appellant is barred from litigating the existence of perjury itself, then he has no right to recover for conspiracy to commit ... perjury." Id. at 1275 n. 11.
 
 
 43
 A civil conspiracy in some circumstances may be distinct from its underlying cause of action, and may possibly permit the assessment of additional damages. See Franklin Music v. American Broadcasting Cos., 616 F.2d 528, 546 (3d Cir.1979) (Sloviter, J., concurring). Nevertheless, the conspiracy count here rests on a single transaction--the alleged unlawful discharge. Consequently, these conspiracy allegations do no more than state a ground for recovery on a different theory; they fail to establish the existence of a separate cause of action for claim preclusion purposes.[4] See Davis, 680 F.2d at 171. See also Ammlung v. City of Chester, 494 F.2d 811, 814 (3d Cir.1974) (statute of limitations for civil conspiracy measured from commission of overt acts).
 
 
 44
 It is worth noting that a criminal conspiracy may be an offense though its purpose is not achieved. In contrast, a civil conspiracy is not actionable unless it causes legal harm. Absent specific injury, a plaintiff asserting civil conspiracy cannot recover. See, e.g., Old Security Life Ins. Co. v. Continental Illinois Nat. Bank & Trust Co., 740 F.2d 1384, 1397 (7th Cir.1984); Hampton v. Hanrahan, 600 F.2d 600, 620-21 (7th Cir.1979), rev'd in part on other grounds, 446 U.S. 754, 100 S.Ct. 1987, 64 L.Ed.2d 670 (1980); Rotermund v. United States Steel Corp., 474 F.2d 1139, 1145 (8th Cir.1973). Adding a conspiracy claim here does nothing to enhance the original cause of action because plaintiff suffered no harm other than that caused by his discharge.
 
 
 45
 Helmig directs us to brush aside technicalities to uncover the nub of the controversy. Having done that here, it becomes obvious that the essence of the plaintiff's complaint is that he was unlawfully discharged from his employment. He advanced that cause of action in the state court and presently brings that same transaction before us. He now rests on allegations of politically motivated retribution by the Township in violation of Elrod v. Burns, 427 U.S. 347, 96 S.Ct. 2673, 49 L.Ed.2d 547 (1976), and Branti v. Finkel, 445 U.S. 507, 100 S.Ct. 1287, 63 L.Ed.2d 574 (1980). Distinct causes of action do not arise merely because the motivations alleged in the two forums differ. Nor, as we have observed, is it critical that one is based on federal law and the other on state law. See Restatement (Second) of Judgments Sec. 25 comment c.
 
 
 46
 It is not significant that the relief obtainable in the two forums varies to some degree. If successful in the state court, plaintiff would have been entitled to reinstatement and backpay. The section 1983 complaint in federal court sought punitive damages and attorney's fees in addition to reinstatement and backpay. Nevertheless, under Helmig, the addition of a request for exemplary damages does not create a separate cause of action in Pennsylvania. Helmig, 398 Pa. at 30, 131 A.2d at 626. Nor is the Civil Rights Act's provision for attorney's fees to a prevailing party sufficient to make the federal claim a distinct cause of action from that raised in the state court. Kremer, 456 U.S. at 481 n. 22, 102 S.Ct. at 1897 n. 22; Davis, 688 F.2d at 171; Restatement (Second) of Judgments Sec. 24 (1982).[5]
 
 
 47
 In Kelly v. Warminister Township Bd. of Supervisors, 512 F.Supp. 658, 663 (E.D.Pa.1981), aff'd mem., 681 F.2d 806 (3d Cir.), cert. denied, 459 U.S. 834, 103 S.Ct. 76, 74 L.Ed.2d 74 (1982), the district judge did not apply claim preclusion to a Section 1983 suit because the state court could only direct reinstatement and backpay, not damages. To the extent that the Kelly decision based its denial of claim preclusion on differences in the relief obtainable, it is disapproved.
 
 
 48
 Nor does the presence of additional defendants in the federal case change the cause of action. The essence of the cause of action asserted against the defendants in the state proceeding is not altered by the addition of more parties. At bottom rests a single incident--the discharge of the patrolman from the police force.
 
 
 49
 We are persuaded that plaintiff had but one cause of action for wrongful discharge, even if different forms of relief were available and varying theories of constitutional and statutory violations potentially were applicable. The claim asserted by plaintiff in both state and federal courts remains indivisible, and thus satisfies the second condition for claim preclusion.
 
 C.
 
 50
 The third prerequisite of claim preclusion demands an identity of parties. This element can be "fuzzy," as Professor Vestal noted, when a single plaintiff sues a succession of multiple defendants who may or may not be in "privity." Vestal, supra, at V-14. When a plaintiff brings successive actions against municipal officials, the problems may spill over--as they do here--into the fourth element of claim preclusion, an identity of capacity. See generally 18 C. Wright, A. Miller & E. Cooper, Federal Practice and Procedure Sec. 4458 (1981).
 
 
 51
 Plaintiff named the Township and Councilmen Gebhart, Danyluk, and Oren as defendants in both the state and federal actions. Those defendants readily meet the identity of parties test, as does plaintiff. Defendants Chehi, Benner, Lesser, and Marcincin were not named in the state suit, but are said to have participated in the municipal decisionmaking process. All but Marcincin were township officials. These defendants do not present a strict identity of parties, but that does not necessarily negate claim preclusion in this instance. We must first consider the fourth element--capacity of the parties.
 
 
 52
 The plaintiff's federal court complaint is deficient in failing to indicate whether he sues the individual defendants in their official or personal capacities. We therefore must interpret the pleading to ascertain what plaintiff should have stated specifically.
 
 
 53
 In the Common Pleas action, plaintiff sued the individual defendants Gebhart, Danyluk and Oren in their official capacities only. The sole relief sought was reinstatement with back pay. Nothing was sought from the personal funds of these three councilmen.
 
 
 54
 In the federal complaint, plaintiff asked that each of the individual defendants, other than Marcincin, be ordered to cause the plaintiff to be reinstated. Accordingly, it is apparent that the same interests are at stake here and that Gebhart, Danyluk and Oren are here sued in the same capacity as in the Court of Common Pleas. Also sued in their official capacities here are defendants Chehi, Benner, and Lesser.
 
 
 55
 It is clear, however, that the individual defendants are not sued solely in their official capacities in the federal action. Plaintiff seeks from each of them punitive, as well as compensatory, damages. Punitive damages cannot be recovered from defendants in their official capacities. Thus, resolving doubts in favor of plaintiff, we will assume he is suing the individuals in their personal capacities as well.
 
 
 56
 The difference between suits filed against municipal officials in their governmental and personal capacities has tended at times to become muddled. In Kentucky v. Graham, 473 U.S. 159, 105 S.Ct. 3099, 87 L.Ed.2d 114 (1985), the Supreme Court emphasized the necessity for observing the distinction, pointing out the salient characteristics that separate the two kinds of cases.
 
 
 57
 Personal-capacity damage suits under section 1983 seek to recover money from a government official, as an individual, for acts performed under color of state law. Official-capacity suits, in contrast, "generally represent only another way of pleading an action against an entity of which an officer is an agent," Monell v. New York City Dep't of Social Services, 436 U.S. 658, 690 n. 55, 98 S.Ct. 2018, 2035 n. 55, 56 L.Ed.2d 611 (1978). "As long as the government entity receives notice and an opportunity to respond, an official-capacity suit is, in all respects other than name, to be treated as a suit against the entity." Kentucky, 473 U.S. at 166, 105 S.Ct. at 3105. It follows therefore that the claims here, insofar as they are against the defendant officials in their official capacities, are only a duplication of the counts asserted against the Township itself.
 
 
 58
 Claim preclusion bars the plaintiff's second legal action against the Township, as well as Gebhart, Danyluk and Oren in their official capacities because all four doctrinal prerequisites have been satisfied in both cases. Chehi, Benner, and Lesser in their official capacities are entitled to the benefit of the judgment because they are in "privity" with the Township.
 
 
 59
 In the claim preclusion context, governmental officials sued in their official capacities for actions taken in the course of their duties are considered in privity with the governmental body. They may invoke a judgment in favor of the governmental entity as may that body itself. See Mears v. Town of Oxford, 762 F.2d 368, 371 n. 3 (4th Cir.1985); Town of Seabrook v. New Hampshire, 738 F.2d 10 (1st Cir.1984); Lee v. City of Peoria, 685 F.2d 196, 199 n. 4 (7th Cir.1982). Even if the Township had not been named as a defendant in the federal court, the officials would nevertheless be entitled, because of this privity, to the bar of the state court judgment. See Restatement (Second) of Judgments Sec. 51 (1982).
 
 D.
 
 60
 The Common Pleas court possessed broad jurisdiction to review Council's action on the sufficiency of the evidence supporting the factual findings and to determine if the plaintiff's constitutional rights had been violated. The state court was not limited to the record compiled during the hearings before the Council. In fact, the plaintiff's initial request for a de novo hearing apparently would have been granted but for his failure to follow through. Finally, it is important to remember that the Police Tenure Act prohibits the discharge of a police officer for political reasons. The broad review exercised by the Court of Common Pleas in the case here stands in marked contrast to the limited authority afforded the state courts in Kremer and in Davis, where claim preclusion was applied nevertheless.
 
 
 61
 Moreover, state judicial review in Davis, which established the foundation for claim preclusion there, came at the instance of the defendant. The plaintiff was an unwilling litigant in the state court, as was the plaintiff in Allen. Here, however, plaintiff controlled the litigation and invoked the review power of the state court. Having taken that route instead of filing suit in federal court as he was entitled to do, plaintiff may not now disavow the action of the forum he chose and whose decision he did not appeal.
 
 
 62
 Accordingly, we conclude that the Township and the individuals in their official capacities (excepting Marcincin) are entitled to invoke claim preclusion. Based on the state court judgment, therefore, judgment was properly entered in their favor in this federal court litigation. With respect to Marcincin and the individual defendants in their personal capacities, further discussion is in order.
 
 III.
 Issue Preclusion
 
 63
 Marcincin was a district justice who testified at the council hearings about the plaintiff's infractions of Township rules. The federal suit alleges that Marcincin conspired with the individual defendants to have plaintiff discharged for his political activities. Marcincin is sued only in his individual capacity.
 
 
 64
 The district court entered judgment in favor of Marcincin and the individual defendants, applying issue preclusion based on the state court's implicit finding that the plaintiff's constitutional rights had not been violated.
 
 
 65
 Under Pennsylvania law, the following conditions must exist before issue preclusion may be invoked:
 
 
 66
 "1. The issue decided in the prior adjudication was identical with the one presented in the later action;
 
 
 67
 2. There was a final judgment on the merits;
 
 
 68
 3. The party against whom the plea is asserted was a party or in privity with a party to the prior adjudication; and
 
 
 69
 4. The party against whom it is asserted has had a full and fair opportunity to litigate the issue in question in the prior action."
 
 
 70
 Safeguard Mut. Ins. Co. v. Williams, 463 Pa. 567, 574, 345 A.2d 664, 668 (1975). See Public Serv. Mut. Co. v. Cohen, 616 F.2d 704 (3d Cir.1980).
 
 
 71
 Plaintiff contends that the state court did not specifically rule on his First Amendment claim and that issue preclusion should not apply. As noted earlier, the plaintiff's brief in the Common Pleas court focused on the bias of the Council members who participated in the hearing, but he did not state specifically that the discharge itself was accomplished for political reasons. The panel majority reads the decision of the Common Pleas court as adjudicating only the action of the Council in upholding the plaintiff's prior discharge. Viewed in that light, the issue decided by the Common Pleas Court was not whether the discharge was politically motivated but whether the hearing was politically biased. Recalling this court's admonition that "[r]easonable doubt as to what was decided by a prior judgment should be resolved against using it as an estoppel," Kauffman v. Moss, 420 F.2d 1270, 1274 (3d Cir.1970), the majority holds that the fact of a political discharge vel non was not adjudicated in the state court. Consequently, issue preclusion does not bar the wrongful discharge claim against the individual defendants in their personal capacity.
 
 
 72
 Judge Weis would hold that the issue of a politically-inspired discharge was inextricably tied to the matters presented in state court. Therefore, the case could not have been adjudicated as it was absent an underlying determination that the plaintiff's discharge did not violate the First Amendment.
 
 
 73
 The judgment in favor of the Township and its officials in their official capacities will be affirmed. The judgment in favor of the individual defendants in their personal capacities will be vacated and the case will be remanded for further proceedings.
 
 
 74
 Before: GIBBONS, Chief Judge, SEITZ, A. LEON HIGGINBOTHAM, Jr., SLOVITER, BECKER, STAPLETON, MANSMANN, GREENBERG, HUTCHINSON, SCIRICA, COWEN, and WEIS, Circuit Judges, and DIAMOND, District Judge*.
 
 SUR PETITION FOR REHEARING
 
 75
 STAPLETON, Circuit Judge.
 
 
 76
 The petitions for rehearing filed by the parties in the above-entitled case having been submitted to the judges who participated in the decision of this Court and to all the other available circuit judges of the circuit in regular active service, and no judge who concurred in the decision having asked for rehearing, and a majority of the circuit judges of the circuit in regular active service not having voted for rehearing by the court in banc, the petitions for rehearing are denied.
 
 
 77
 Judge Hutchinson would grant rehearing.
 
 
 
 *
 The Honorable Gustave Diamond, United States District Judge for the Western District of Pennsylvania, sitting by designation
 
 
 [1]
 Cited by A. Vestal, Res Judicata/Preclusion at V-8 n. 11 (1969), quoting Justice Heffernan of the Wisconsin Supreme Court, Bischoff v. First Wisconsin Trust Co., 30 Wis.2d 583, 591, 141 N.W.2d 188, 193 n. 1 (1966)
 
 
 [2]
 We refer to the Township's elected governing body as the Lower Saucon Township Council. This conforms with its designation under the Administrative Code of the Township of Lower Saucon--1976, Ord. No. 76-4, which adopted an Optional Plan of Council-Manager government in place of the former Board of Supervisors
 
 
 [3]
 28 U.S.C. Sec. 1738 reads in pertinent part:
 "The ... judicial proceedings of any court of any ... State ... shall have the same full faith and credit in every court within the United States and its Territories and Possession as they have by law or usage in the courts of such State, Territory or Possession from which they are taken."
 This statute supplements the provision found in Article IV, Sec. 1 of the Constitution, which applies full faith and credit only to state courts.
 
 
 [4]
 We further note that some doubt exists whether township officials, acting within their official capacities, may enter into an actionable conspiracy with their municipality. See Martin v. D.C. Metro. Police Dep't., 812 F.2d 1425 (D.C.Cir.), modified in irrelevant part, 817 F.2d 144 (1987); Buschi v. Kirven, 775 F.2d 1240 (4th Cir.1985); Herrmann v. Moore, 576 F.2d 453 (2d Cir.), cert. denied, 439 U.S. 1003, 99 S.Ct. 613, 58 L.Ed.2d 679 (1978); Dombrowski v. Dowling, 459 F.2d 190 (7th Cir.1972). Cf. Novotny v. Great American Federal Savings & Loan Ass'n, 584 F.2d 1235 (3d Cir.1978), vacated on other grounds, 442 U.S. 366, 99 S.Ct. 2345, 60 L.Ed.2d 957 (1979)
 
 
 [5]
 It is also worth mentioning that plaintiff could have pursued his remedy under section 1983 in the state court, which had concurrent jurisdiction with the district court to address and remedy violations of federal constitutional law. See Restatement (Second) of Judgments Sec. 25 comment c (1982). If he were a prevailing party in the state court, he would be entitled to counsel fees under 42 U.S.C. Sec. 1988
 
 
 *
 The Honorable Gustave Diamond, United States District Judge for the Western District of Pennsylvania, sitting by designation