**PRECEDENTIAL**

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT
_____

No. 16-1224
_____


UNITED STATES OF AMERICA,

v.

RANDY POULSON,
                                   Appellant


_____


On Appeal from the District Court
for the District of New Jersey
(District Court No. 1-14-cr-00309-001)
District Court Judge:  Honorable Renee M. Bumb

_____


Submitted under Third Circuit L.A.R. 34.1(a)
on April 28, 2017


Before: McKEE, VANASKIE and RENDELL,
Circuit Judges

(Opinion filed: September 14, 2017)

Mark E. Coyne
Office of United States Attorney
970 Broad Street
Room 700
Newark, NJ 07102

Deborah P. Mikkelsen
Office of United States Attorney
Camden Federal Building & Courthouse
401 Market Street
Camden, NJ 08101

       Counsel for Plaintiff-Appellee United States of
       America

Robert Epstein
Brett G. Sweitzer
Federal Community Defender Office for the Eastern District
of Pennsylvania
601Walnut Street
The Curtis Center, Suite 540 West
Philadelphia, PA 19106

       Counsel for Defendant-Appellant Randy
       Poulson

_____

2

# OPINION

_____

RENDELL, <u>Circuit Judge</u>:

From 2006 through 2011, Appellant Randy Poulson tricked homeowners facing foreclosure into selling him their homes and engaged in a multi-million-dollar Ponzi scheme that defrauded investors in those distressed properties. Poulson pleaded guilty to one count of mail fraud in violation of 18 U.S.C. § 1341, and the District Court calculated his total fraud to be $2,721,240.94. The District Court concluded that this fraud resulted in "substantial financial hardship" for more than twenty-five victims. The District Court accordingly sentenced Poulson to 70 months' imprisonment followed by three years of supervised release. As a condition of supervised release, the District Court prohibited Poulson from working in the real estate industry for five years. Poulson now appeals, urging that the District Court erred with respect to two aspects of his sentence: (1) the District Court's determination of the number of victims who, as a result of Poulson's fraud, suffered a "substantial financial hardship" under § 2B1.1 of the U.S. Sentencing Guidelines ("Guidelines"), and (2) the District Court's imposition of a five-year occupational restriction as part of the terms of his supervised release. Because we conclude that the District Court properly used the considerable discretion afforded to it by § 2B1.1, we will affirm the District Court's finding as to the number of victims who endured a "substantial financial hardship" under the Guidelines. We agree with Poulson, however, that the District Court erred in imposing the five-year occupational restriction on his three-year term of

3

supervised release, and we will vacate and remand the case to the District Court to correct the sentence with respect to the terms of Poulson's supervised release only.

## I.

Beginning around July 2006, Poulson used a variety of sources to construct and perpetuate a fraudulent real estate investment scheme. Poulson targeted homeowners facing foreclosure on their properties and offered to purchase the deeds to their residences, falsely promising that he would pay their mortgages in return for the sales. He conducted these transactions through Equity Capital Investments, LLC ("Equity Capital"), a limited liability real estate investment company that he established. Poulson ultimately acquired the deeds to more than twenty-five distressed homeowners' residences.

Poulson also established Poulson Russo LLC, a real estate investment education company through which he organized speeches, seminars, monthly dinners, and private tutorials that purported to teach real estate investing tips to individuals who paid fees to attend the events. Poulson solicited the attendees at these events to invest in Equity Capital and falsely claimed in written and oral materials that the investors' money would be used to fund the purchase, maintenance, and improvement of specific residential properties. He also drew on his contacts from the South Jersey Real Estate Investors Association, where he had previously served as president, as well as on family and friends.

Poulson ultimately convinced over fifty people to invest in Equity Capital, and those investors sent him their

4

money either by wire transfer or through the U.S. Postal Service. Poulson promised them that their money would be used to purchase and improve properties, which would then be rented, and he assured them that their investments would be secured by mortgages. The investors typically executed promissory notes with Equity Capital that guaranteed a 10% to 20% return, monthly interest payments, and a fixed maturity date. Poulson used the properties he had purchased from the distressed homeowners to secure the promissory notes, but with a group of over fifty investors, he often used—unbeknownst to them—the same properties to secure multiple investments. Poulson also used the funds invested to finance his personal expenses.

When this "business model" began to "unravel and fall apart," A. 213, Poulson fashioned a classic Ponzi scheme and used newly obtained money to repay earlier investors. The scheme soon collapsed, eventually leading Poulson to stop paying the monthly mortgages on the properties and causing those mortgages to go into foreclosure—all without the distressed homeowners' knowledge. Poulson's fraud ultimately cost over fifty of his investors more than $2.7 million.

On June 23, 2015, Poulson pleaded guilty to one count of mail fraud in violation of 18 U.S.C. § 1341. Poulson's sentencing took place over the course of two days. At the first sentencing hearing, held on December 16, 2015, the District Court recognized that the term "substantial financial hardship" was a "new provision" in the 2015 Guidelines that increases an offense level based on the extent of harm that particular victims suffer as opposed to the previous version of

5

the enhancement that looked primarily at the total number of victims.[1]  (A. 116.)

At the second sentencing hearing on January 20, 2016, the District Court addressed Poulson's objection regarding the application of § 2B1.1 as it related to certain victims.  The District Court examined the contours of the newly amended enhancement and rejected Poulson's contention that it needed to know "how much money [each victim] started with" in order to determine whether a "substantial financial hardship" occurred.  (A. 169.)  The District Court reasoned:

> I don't care if it was someone who started with a million dollars or a hundred thousand dollars, if they filed for bankruptcy because they lost their money they qualified. . . . It is hard to envision that what is contemplated by this [G]uideline is that the victims must come forward and lay out their financial wherewithal. . . . It seems to me that if victims fill out a victim statement or a victim declaration and say that they lost their retirement funds, not all but some, that they had to file bankruptcy, that they had to move in with their daughter or whatever,

---

[1] Poulson's plea agreement, dated March 27, 2015, predated the amended enhancement, which took effect on November 1, 2015, and therefore the parties did not have an opportunity to consider the application of "substantial financial hardship" to the victims of Poulson's fraud.

> that those are substantial financial hardships.
> We're not talking about the Donald Trumps.

(A. 170–71.) The District Court then reviewed and incorporated the impact statements submitted by the victims into its findings, using them to determine whether each victim suffered a "substantial financial hardship." It ultimately found that at least twenty-five victims had experienced this type of harm.

The District Court's computation of Poulson's offense level under the 2015 Guidelines[2] went as follows: Poulson's offense under 18 U.S.C. § 1341 put him at a base offense level of seven. U.S.S.G. § 2B1.1(a)(1). The District Court found that the amount of the loss ranged between $1.5 million and $3.5 million, increasing the offense level by sixteen,

---

[2] The District Court also engaged in a lengthy discussion with counsel about which version of the Guidelines to use. Both the 2009 and the 2015 versions were potentially applicable, the former being in effect at the time of Poulson's offense and the latter at the time of his sentencing. However, pursuant to U.S.S.G. § 1B1.11, sentencing courts are to use the Guideline Manual in effect at the time of sentencing unless doing so would run afoul of due process. U.S.S.G. § 1B1.11(a)–(b)(1). The District Court calculated Poulson's offense level under each version and then compared the two outcomes. The District Court, with the parties' consent, reasoned through Poulson's sentence based on the 2015 version of the Guidelines and looked to the nature of the hardship, not merely the number of victims.

U.S.S.G. § 2B1.1 (b)(1)(I), and that over twenty-five investors endured a "substantial financial hardship," increasing the offense level by six, U.S.S.G. § 2B1.1(b)(2)(C). The District Court also found that the "sophisticated means" and "obstruction of justice" enhancements, which would have each increased the offense level by two, U.S.S.G. §§ 2B1.1(b)(10) and 3C1.1, did not apply. With the total offense level then at 29, the District Court found that Poulson deserved credit for accepting responsibility under U.S.S.G. §§ 3E1.1(a) and (b), and it reduced the offense level to twenty-six. This calculation placed Poulson's sentence in a range of 63 to 78 months' imprisonment under the Guidelines. The District Court then analyzed the 18 U.S.C. § 3553(a) factors and sentenced Poulson to 70 months' imprisonment followed by three years of supervised release with an occupational restriction that barred him from working in the real estate industry for five years.[3] This timely appealed followed.

---

[3] The District court also ordered Poulson to conduct 100 hours of community service and to pay restitution to victims and a $100 special assessment.

## II.[4]

### A. "Substantial Financial Hardship"

Poulson challenges the District Court's application of the § 2B1.1 enhancement based on eight victims who Poulson contends did not suffer the level of "substantial financial hardship" contemplated by the Guidelines. If the District Court had correctly applied the enhancement, Poulson argues, "it would have counted fewer than 25 victims who suffered such hardship, and thus it would not have triggered the 6-level increase." (Appellant's Br. 11.) We will first address the enhancement in general and then turn to the specific victims whose inclusion Poulson challenges.

Section 2B1.1 of the Guidelines provides for increased offense levels for economic crimes that "result[] in substantial financial hardship" to victims. U.S.S.G. § 2B1.1(b)(2)(A)–(C). This enhancement is a recent addition to the Guidelines that took effect on November 1, 2015. It advises sentencing courts to consider the extent of the harm rather than merely the total number of victims of the offense (as its predecessor did) in an effort to "place greater emphasis on the extent of harm that particular victims suffer as a result of the offense." Sentencing Guidelines for the United States Courts, 80 Fed. Reg. 25,782, 25,791 (May 5, 2015). The newly amended § 2B1.1 is thus "[c]onsistent with the Commission's overall

---

[4] The District Court had subject matter jurisdiction under 18 U.S.C. § 3231. We have appellate jurisdiction under 18 U.S.C. § 3742(a).

9

goal of focusing more on victim harm" and "ensures that an offense that results in even one victim suffering substantial financial harm receives increased punishment, while also lessening the cumulative impact of loss and the number of victims, particularly in high-loss cases." United States Sentencing Commission, *Guidelines Manual*, Supplement to Appendix C 112–13 (Nov. 1, 2015).

Though § 2B1.1 "effect[ed] a substantive change" to the Guidelines, *United States v. Jesurum*, 819 F.3d 667, 672 (2d Cir. 2016), our Court has not yet had the opportunity to consider it, and the challenge to its application presents us with an issue of first impression. Despite the scarcity of relevant case law, Application Note 4(F) offers instructive commentary that sentencing courts are required to consider when applying § 2B1.1. *See United States v. Knobloch*, 131 F.3d 366, 372 (3d Cir. 1997) ("Courts are required to follow the Application Notes . . . in imposing sentences for federal offenses."); *see also United States v. Minhas*, 850 F.3d 873, 877 (7th Cir. 2017) (noting the authority of the application notes in the context of U.S.S.G. § 2B1.1(b)(2)). Application Note 4(F) states:

> In determining whether the offense resulted in substantial financial hardship to a victim, the court shall consider, *among other factors*, whether the offense resulted in the victim—
>
>> (i) becoming insolvent;
>> (ii) filing for bankruptcy under the Bankruptcy Code . . . ;

10

> (iii) suffering substantial loss of a retirement, education, or other savings or investment fund;
> (iv) making substantial changes to his or her employment, *such as* postponing his or her retirement plans;
> (v) making substantial changes to his or her living arrangements, *such as* relocating to a less expensive home; and
> (vi) suffering substantial harm to his or her ability to obtain credit.

U.S.S.G. § 2B1.1(2) cmt. n.4 (emphasis added); *see also* U.S.S.G. App. C at 112 (referring to Application Note 4(F)'s list of factors that courts consider in assessing "substantial financial hardship" as "non-exhaustive").[5]

---

[5] Poulson urges that there are "three key insights" to glean from the texts of § 2B1.1 and Application Note 4(F): (1) the victim must have suffered "qualitative harm" over and above the loss itself (Appellant's Br. 14); (2) the harm must be monetary, so "non-pecuniary harms, such as personal or familial distress, . . . do not qualify" (*id.* at 15); and (3) the hardship must be "large enough to trigger a significant change in life circumstances" (*id.*). These "insights" are unavailing, as they are based solely on a discrete set of factors despite the fact that the set is not exhaustive. More specifically, the "insights" overlook Application Note 4(F)(iii), *i.e.*, the factor listing "substantial loss of a retirement, education, or other savings or investment fund." The Commission's inclusion of this factor neither requires a "qualitative harm" nor necessarily "trigger[s] a significant change in life circumstances."

11

We agree with the observation by our sister circuits that the determination of "substantial financial hardship" is subject to the usual—and significant—degree of discretion afforded a district court during sentencing:

> [B]etween a minimal loss or hardship (occurring, perhaps, when a defendant fraudulently obtains five dollars a victim had intended to donate to charity), and a devastating loss (occurring in the wake of a scheme to wipe out of a victim's life savings), there lies a wide range in which we rely upon the judgment of the district courts, guided by the non-exhaustive list of factors in Application Note 4[(F)]. In the end, this is just one more determination of a fact that bears on the ultimate sentence; that determination is entitled to the normal deference that applies to all facts found at sentencing.

*Minhas*, 850 F.3d at 878; *see also United States v. Brandriet*, 840 F.3d 558, 561–62 (8th Cir. 2016) (noting that even though the district court relied on a "thin" evidentiary record as well as its own inference to determine "substantial financial hardship," it was not clear error for it to have done so).

That discretion is crucial, as § 2B1.1's increased emphasis on individual harm means that "substantial financial hardship" is measured on a sliding scale that is also fairly subjective. We echo the analysis by the Seventh Circuit that:

12

> The 2015 amendment to § 2B1.1(b)(2) introduces a measure of relativity into the inquiry. That is, whether a loss has resulted in a substantial hardship . . . will, in most cases, be gauged relative to each victim. The same dollar harm to one victim may result in a substantial financial hardship, while for another it may be only a minor hiccup. Much of this will turn on a victim's financial circumstances, as the district court recognized when it noted that "[a] loss that may not be substantial to Bill Gates may be substantial to a working person."

*Minhas*, 850 F.3d at 877–78.[6]   Still, this "measure of relativity" does not require the sentencing court to identify

---

[6] We are not persuaded by Poulson's attempt to distinguish *Minhas* on the basis that the District Court in our case "specifically rejected" the argument that "substantial financial hardship" was a "relative term." Poulson Rule 28j Letter dated Mar. 30, 2017, at 1. Nor do we view the District Court's approach in our case as incompatible with that taken in *Minhas*. While we agree with *Minhas* that the severity of a financial hardship generally depends on both the value of the loss and the victim's financial means (and is therefore "relative" to the victim's wealth), 850 F.3d at 877, the determination of "substantial financial hardship" is not based on those numbers alone. Just as the Guidelines do not require a specific dollar amount to qualify as a "substantial financial hardship," they also do not require the loss of a specific percentage of the victim's wealth. The District Court in this case took direct account of the impact of each victim's loss on his or her overall financial health and appropriately used its

finite dollar amounts—the amount a victim started with and then ended up with after the fraud—when it measures "substantial financial hardship." To the contrary, it is axiomatic that sentencing courts may draw reasonable inferences from the factual record before them. *See United States v. Cicirello*, 301 F.3d 135, 141 (3d Cir. 2002) ("[T]he sentencing court is always free to draw inferences from facts of record . . . ."); *see also United States v. Loney*, 219 F.3d 281, 288 (3d Cir. 2000) (noting that the district court drew reasonable inferences when it found a relationship between defendant's gun possession and his drug possession). Sentencing courts may therefore look at the factual record to infer the extent of the financial loss endured by a particular victim, and the District Court acted within the discretion afforded by the Guidelines when it did so here.

We note that in other legal contexts, the word "substantial" has been treated as occupying a middle ground, with courts typically focusing on magnitude and permanence

---

discretion to infer the magnitude of financial hardship based on the actions each victim was forced to take as a result. In other words, it determined the nature of each victim's loss relative to his or her personal circumstances. Further, the District Court arguably construed the Guidelines *more* strictly than the court in *Minhas*. In contrast to the sentencing court in *Minhas*, which held "it was more likely than not" that certain victims qualified for the § 2B1.1 enhancement, 850 F.3d at 879, the District Court in this case made individualized findings after reviewing each victim's loss amount and impact statement.

14

to determine substantiality. When applied to evidence, for example, "substantial" means "more than a mere scintilla," *Plummmer v. Apfel*, 186 F.3d 422, 427 (3d Cir. 1999) (internal quotation marks omitted), "not overwhelming," *Gregory v. Chehi*, 843 F.2d 111, 114 (3d Cir. 1988), and enough that a "reasoning mind might accept as adequate to support a conclusion," *Cotter v. Harris*, 642 F.2d 700, 704 (3d Cir. 1981). Other circuits have held that a "substantial" financial hardship in the tax payment context must be more than a mere inconvenience, but rather a form of "sacrifice." *See Matter of Carlson v. United States*, 126 F.3d 915, 921 (7th Cir. 1997). More broadly, Black's Law Dictionary defines "substantial" as "having actual, not fictitious, existence"; "of real worth and importance"; "considerable in amount or value"; and "having permanence or near-permanence; long lasting."[7] *Substantial, Black's Law Dictionary* (10th ed. 2014). When applying the term to financial hardship in the sentencing context, therefore, we ought to consider not only the pecuniary value of the loss but also such intangibles as its impact on the victim. A loss of a large volume of savings that is quickly regained or has minimal effect on the victim is likely not a substantial financial hardship. As when using "substantial" in other

---

[7] When a statutory term is undefined, we give it its ordinary meaning. *United States v. Santos*, 553 U.S. 507, 511; *Cadapan v. Att'y Gen.*, 749 F.3d 157, 161 (3d Cir. 2014). We may refer to legal and general dictionaries to ascertain the ordinary meaning of a term. *Pa., Dep't of Pub. Welfare v. U.S. Dep't of Health & Human Servs.*, 647 F.3d 506, 511 (3d Cir. 2011).

15

contexts, so too here, there is no specific percentage of total earnings or duration of impact that demarcates a substantial financial hardship from an insubstantial one. The term's fluidity across various legal applications thus buttresses the conclusion of the District Court and of other courts that drawing inferences based on a variety of facts is appropriate in construing "substantial financial hardship."

With these principles in mind, we now turn to the specific victims who Poulson argues did not endure "substantial financial hardship" as defined by the Guidelines.[8]

---

[8] Of the eight victims in question, three—LF, CS, and NN—lost money in accounts that were joint with their respective spouses. The District Court counted each couple as one victim but recognized that it could have counted them separately. If the District Court had counted the married couples as two separate victims, the total number of victims would have been 33 instead of 27. Poulson does not directly challenge the District Court's (unexplained) decision to count this way, and only argues that if we find that each victim should have been counted individually, then we "should remand the case for further proceedings, as there is insufficient evidence in the record to determine the nature of the couples' joint accounts and the spouses' individual hardships." (Appellant's Br. 18–19 n.6.) We disagree with that characterization of the record and note—as the District Court recognized during sentencing—that the District Court could have counted each married victim separately despite the titling of their account. *See United States v. Ryan*, 806 F.3d 691, 694 (2d Cir. 2015). Though the commentary to § 2B1.1 defines a "victim" as "any person who sustained any part of

16

The applicable standard of review depends on whether Poulson raised his objection to the victim in question before the District Court. "Where an objection is preserved at sentencing," as Poulson's was with respect to CD and LF, "we exercise plenary review of a district court's interpretation of the Guidelines but review its factual findings for clear error." *United States v. Fountain*, 792 F.3d 310, 318 (3d Cir. 2015). Because we are tasked with reviewing the District Court's interpretation of "substantial financial hardship" under the Guidelines, we exercise plenary review over the challenge to the enhancement insofar as it is based on CD and LF.[9] *See United States v. Nagle*, 803 F.3d 167, 179 (3d Cir.

---

the actual loss," U.S.S.G. § 2B1.1 cmt. n.1, the District Court was not required to count each spouse separately.

[9] The Government is incorrect that the clear error standard governs our review of Poulson's challenge to the enhancement as based on CD and LF. As the Government rightly notes, we have consistently held that "[i]f the facts underlying a Guidelines determination are not in dispute, 'but the issue is whether the agreed-upon set of facts fit within the enhancement requirements,' we review the District Court's application of the enhancement for clear error." *Fountain*, 792 F.3d at 318 (quoting *United States v. Fish*, 731 F.3d 277, 279 (3d Cir. 2013)). But that is not the issue presented to us. Poulson's appeal tasks us with reviewing the contours of § 2B1.1 as well as whether the District Court construed the amended enhancement correctly when assessing the magnitude of CD's and LF's respective losses. That is not the same as determining whether undisputed facts align correctly with specific statutory requirements.

2015) ("When the calculation of the correct Guidelines range turns on an interpretation of 'what constitutes loss' under the Guidelines, we exercise plenary review."); *United States v. Fumo*, 655 F.3d 288, 309 (3d Cir. 2011) ("The appropriate standard of review of a district court's decision regarding the interpretation of the Sentencing Guidelines . . . is plenary."); *United States v. Kennedy*, 554 F.3d 415, 418 (3d Cir. 2009) ("The District Court's interpretation of the Sentencing Guidelines is subject to plenary review.").

Poulson did not contest the District Court's inclusion of the remaining six victims—BDA, SP, CS, SB, NN, and SO—at sentencing. We therefore review the application of the enhancement as it relates to those victims for plain error. *United States v. Moreno*, 809 F.3d 766, 773 (3d Cir. 2016) (citing *United States v. Wood*, 486 F.3d 781, 790 (3d Cir. 2007)). To prevail on these six challenges, therefore, Poulson must show that there is "(1) an error; (2) that is plain; (3) that affects substantial rights; and (4) which seriously affects the fairness, integrity, or public reputation of judicial proceedings." *Id.* It is not sufficient if the legal error is "subject to reasonable dispute." *Puckett v. United States*, 556 U.S. 129, 135 (2009). Even if Poulson satisfies those four requirements, we may still deny his challenge. *See United States v. Tyson*, 653 F.3d 192, 211 (3d Cir. 2011); *see also United States v. Olano*, 507 U.S. 725, 735–36 (1993).

Finally, we note that we may "affirm the rulings of the District Court for any proper reason that appears on the record even where not relied on by it." *United States v. Perez*, 280 F.3d 318, 337 (3d Cir. 2002).

### i. Victims CD and LF[10]

CD lost $60,000 in retirement savings to Poulson and successfully obtained a $124,184.60 civil judgment against him that included the $60,000 lost principal as well as the promised interest. In finding that CD had endured a "substantial financial hardship," the District Court counted the fact that she "was forced to file a civil lawsuit," noting that it was not an "enumerated factor under the [G]uidelines" but that the factors listed in the Guidelines were not exclusive. (A. 183.) LF lost $70,661 in a retirement/savings fund, and the District Court noted that "[she] now ha[s] to work longer to make up for the money." (A. 184.) In addressing Poulson's objection to these victims at the hearing, the District Court also noted that it was "call[ing] out . . . important facts, not necessarily the only important facts." (A. 193.)

Poulson argues on appeal that in CD's case, the monetary loss did not amount to a "significant life consequence, or 'hardship'" (Appellant's Br. 16), and that mere "impact[]" to a retirement plan, as in LF's case, was not enough to constitute a "substantial financial hardship" (*id*. at 17). These arguments are not persuasive. As we have discussed *supra*, the factors listed in Application Note 4(F)

---

[10] We note that the appendix containing the victim impact statements is sealed. The panel notified counsel for both parties of its intent to make reference to some of the contents of the victim impact statements and received no objection to their disclosure.

19

are not exhaustive, and the financial burden of filing a lawsuit and proceeding with litigation is not only a relevant factor but also potentially indicative of the magnitude of the loss to CD given that it was apparently substantial enough to move her to pursue litigation. LF's entire victim impact statement, which the District Court incorporated into its findings, likewise offers sufficient examples of life consequences that the District Court was justified in construing as a "substantial financial hardship."[11] Therefore, given CD's and LF's respective impact statements, as well as the criteria required by "substantial," we reject Poulson's challenge to his sentence insofar as it relates to these two victims and hold that the District Court did not commit legal error in finding that CD and LF endured "substantial financial hardship" under the Guidelines.

### ii. Victims BDA, CS, SO, SP, SB, and NN

BDA's loss of $16,000 to Poulson sabotaged her plan to use her investment with Poulson to purchase a home for herself and her 87-year-old sister. We are not persuaded by Poulson's argument that the District Court plainly erred on the grounds that that "this hardship is not akin to being forced to leave a home." (Appellant's Br. 16.) To the contrary, it comfortably fits in with the factors of "suffering substantial

---

[11] For example, LF wrote in a letter to the District Court that the monetary loss forced her to shorten her maternity leave and postpone purchasing a car and home. Contrary to Poulson's assertion, these impacts on her life surely signal significant financial difficulty.

loss of a . . . savings or investment fund," Application Note 4(F)(iii), and "substantial changes to . . . living arrangements," Application Note 4(F)(v).

CS lost $9,500 in a joint investment account with his wife, a loss that CS stated "impacted [their] savings substantially and altered [his] wife's retirement plans." (A. 252.) SO and his wife, who is completely reliant on SO for retirement savings, invested $13,000 in a retirement account with Poulson. His fraud cost them the principal as well as $3,120 in interest—approximately 25% of their total retirement savings. Poulson urges that the District Court erroneously applied the enhancement based on CS and SO, reasoning that there was no "substantial financial hardship merely because their retirement plans were 'altered' or 'impacted'" and noting that "there was no indication that these victims actually had to delay their retirements." (Appellant's Br. 17.) But the Guidelines do not in any way indicate that "substantial financial hardship" is conditional on retirement delay, and the application was therefore not clear error.

Poulson similarly contends that SP, SB, and NN should not have qualified as having endured "substantial financial hardship," though he does not articulate his reasoning. SP lost $42,250 in an investment fund, forcing him to work additional side jobs; SB lost $10,000 in a retirement fund; and NN, along with his wife, lost $11,000 in a retirement fund to Poulson, forcing them to restart their retirement savings "from scratch" (A. 256). The record supports the District Court's finding that all of these losses amounted to "substantial financial hardship," and Poulson has

21

not cited to anything that would indicate it was clear error for the District Court to apply the enhancement accordingly.

We recognize Poulson's argument that by virtue of including the word "substantial," the Commission intended a limiting principle to confine the application of § 2B1.1. (*See* Appellant's Br. 17 ("Although LF specified that she and her husband had to work longer to make up the money that they had lost, that is necessarily true of any victim who loses money from a retirement fund.").) But we are not persuaded that the Commission intended the enhancement to be as limited, or as difficult to satisfy, as Poulson urges. Indeed, Application Note 4(F) itself states that its explanatory factors are not exhaustive, and the other courts that have reviewed § 2B1.1 have all emphasized the sentencing court's considerable discretion in determining where on the "wide range" between "a minimal loss or hardship . . . and a devastating loss" a particular victim's loss might fall. *Minhas*, 850 F.3d at 878; *see also Brandriet*, 840 F.3d at 561–62. To that end, though Poulson is determined that the enhancement cannot possibly be justified by all of the victims identified by the District Court, he has not explained how the District Court's inclusion of these eight victims amounts to plain error such that "the legal error [was] clear or obvious, rather than subject to reasonable dispute."[12] *Puckett*, 556 U.S. at 135; *see also United States v. Clark*, 237 F.3d 293,

---

[12] Beyond the considerable latitude afforded by the Guidelines, Poulson arguably faces an even higher hurdle to demonstrating that the error was "clear or obvious" given the scarcity of case law on this recently enacted enhancement.

298–99 (3d Cir. 2001) (quoting *Olano*, 507 U.S. at 734) (holding that an argument that was "plausible" and "within the range of possibility" was not enough to show that an error was "clear under current law").

## B. Terms of Supervised Release

Poulson's next challenges the District Court's imposition of a five-year occupational restriction as part of the terms of his supervised release. Because Poulson failed to object to this term at sentencing, we review the challenge for plain error. *Fountain*, 792 F.3d at 318.

Poulson argues that the District Court erred by imposing an occupational restriction that bars him from working in the real estate industry for five years because Poulson's term of supervised release is only three years, which is the statutory maximum.[13] The Government concedes that the statutory maximum prohibits an occupational restriction for more than three years and that "a limited remand is appropriate . . . [to] allow the District Court to correct the sentence so that the occupational restriction is coterminous with the term of supervised release." (Appellee's Br. 39.)

The parties are correct on the relevant law. 18 U.S.C. § 3583 authorizes a sentencing court to impose a term of

---

[13] Poulson does not contest the three-year term of supervised release or the occupation restriction during those three years.

23

supervised release that follows a defendant's term of imprisonment. The statute sets the maximum term of supervised release based on the offense of conviction. 18 U.S.C. § 3583(b). In this case, Poulson pled guilty to one count of mail fraud in violation of 18 U.S.C. § 1341, which is a Class C felony. *See* 18 U.S.C. § 3559(a)(3) (Class C felony is one for which maximum prison sentence is between 10 and 25 years); 18 U.S.C. § 1341 (maximum prison sentence for mail fraud is 20 years). The District Court was therefore only authorized to impose a maximum term of three years' supervised release on Poulson. Because the District Court imposed, as a term of supervised release, an occupational restriction lasting five years, this part of Poulson's sentence amounted to plain error. *See United States v. Lewis*, 660 F.3d 189, 192 (3d Cir. 2011) ("A sentence that exceeds the statutory maximum constitutes plain error.").

We will therefore vacate and remand this case to the District Court for the "sole and limited purpose of correcting the sentence . . . to reflect the applicable statutory provisions." *United States v. Kukafka*, 478 F.3d 531, 540 (3d Cir. 2007). The occupational restriction cannot exceed three years.

## III.

For the foregoing reasons, we will affirm Poulson's sentence with respect to the § 2B1.1 "substantial financial hardship" enhancement, and we will vacate and remand the case to the District Court to correct the sentence with respect to the terms of Poulson's supervised release only.