In the

# United States Court of Appeals

## For the Seventh Circuit

Nos. 15-3761 & 15-3763

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

*v.*

RASHID MINHAS,

*Defendant-Appellant.*

Appeals from the United States District Court for the
Northern District of Illinois, Eastern Division.
Nos. 14 CR 731, 13 CR 919 — **Gary Feinerman**, *Judge.*

ARGUED OCTOBER 27, 2016 — DECIDED MARCH 10, 2017

Before WOOD, *Chief Judge*, and BAUER and MANION, *Circuit Judges*.

WOOD, *Chief Judge*. Rashid Minhas used the Chicago-based travel agencies he operated to swindle customers and airlines out of hundreds of thousands of dollars. Minhas was convicted of wire and mail fraud in violation of 18 U.S.C. §§ 1341 and 1343 in two separate cases: one that proceeded to a bench trial in February 2014, and one in which Minhas pleaded

guilty in 2015. At a consolidated sentencing hearing, the district court imposed two partially concurrent prison terms totaling 114 months. On appeal from the two judgments, Minhas challenges the district court's application of the Sentencing Guidelines' enhancement for causing "substantial financial hardship" to the two sets of victims. U.S.S.G. § 2B1.1(b)(2). Though we have seen stronger evidence, we are not convinced that the district court committed clear error in its assessment of the record, and so we affirm its judgment.

## I

The first case (the "City Travel case") arose from Minhas's operation of City Travel & Tours. In 2008 and 2009, Minhas defrauded customers of City Travel and airlines through a scheme in which he collected payment for airline reservations that he canceled without his customers' knowledge. By manipulating the two-tiered online ticket-reservation system, Minhas was able to make reservations for customers paying by cash or check, print paper tickets and itineraries, and then cancel the reservations prior to the airlines' receipt of payment for the tickets. Because the customers had paper tickets in hand, many were not aware the tickets were void until they arrived at the airport. In some instances, customers were forced to purchase last-minute replacement tickets or forego their travel. In others, the airlines allowed the customers to travel on the voided tickets and received no compensation. All told, approximately 372 customers lost money through the City Travel scheme: five lost more than $7,000 apiece, 14 lost over $5,000, and 172 lost more than $1,000.

Minhas was charged in an indictment in case 13 CR 919 with seven counts of wire and mail fraud for the City Travel scheme. Undeterred by these charges, he swindled at least 50

additional customers while he was on pretrial release; this time, he used another of his travel agencies, Lightstar Hajj. Lightstar Hajj held itself out as specializing in travel packages to Saudi Arabia for the hajj (an Islamic pilgrimage to Mecca). In fact, it could not sell a complete package, because it lacked the ability to provide the necessary visas. Minhas sold over 50 of these fraudulent travel packages, for which he faced mail fraud charges in case 14 CR 731. About 54 victims lost money through the Lightstar Hajj scheme: 18 customers each lost over $10,000, 30 lost more than $7,000, and 45 lost more than $5,000. As we noted earlier, he was eventually convicted on all counts in the City Travel case, and he pleaded guilty to one count in the Lightstar Hajj case.

When the time came for sentencing, the two cases were consolidated before Judge Feinerman. The probation office prepared a total of five pre-sentencing reports: one in each of the two cases prior to their consolidation, and three supplemental reports thereafter. The district court held a sentencing hearing, at which it heard testimony from five victims: one from the City Travel case, two from Lightstar Hajj, and two from an uncharged fraud scheme. (Ten victims of the City Travel case had testified at trial.) The government also presented charts listing the victims and their loss amounts. Ten victims of the Lightstar Hajj case submitted impact letters to the district court.

A key topic at the hearing was whether to apply the Guidelines enhancement for causing "substantial financial harm" to victims—a provision that had gone into effect earlier that month. U.S.S.G. § 2B1.1(b)(2). The court noted that it was focusing on the victims' financial losses in both cases as losses

to a savings or investment fund, a factor Application Note 4(F)(iii) to the Guidelines directs courts to consider.

In the City Travel case, the district judge agreed with Minhas that the term "substantial" was relative to a victim. It reasoned that dollar losses in the mid-four figures would represent a substantial loss to a person of modest economic circumstances. It then inferred that Minhas's victims fit this economic profile: they were "working" people "of modest means" who were "not rich." In characterizing the victims this way, the district court explained that it was extrapolating from the evidence before it (*i.e.*, the testimony at trial and sentencing and from victim impact letters) and applying those characteristics to the group. The court then looked to a chart displaying the dollar losses for each victim and found at least 16 losses over $3000. Noting that it believed that losses below $2000 could still be substantial, as this was "a lot of money for a working person," the court "err[ed] on the side of caution" and excluded from its tally victims who lost less than $2000. It ultimately applied the § 2B1.1(b)(2)(B) four-level increase in the in the City Travel case, finding that between five and 25 victims suffered a substantial financial hardship as a result of Minhas's fraud.

Similarly, in the Lightstar Hajj case, the district court relied on victim-impact letters and sentencing testimony to generalize about the group of victims, finding that they tended to save for years, that many were not able to make the Hajj because of Minhas's fraud, and that it could also take years to recover the amounts of money they lost. The court then consulted the loss chart and counted at least 32 victims with dollar losses above the mid-four figures. It applied a six-level enhancement pursuant to § 2B1.1(b)(2)(C), finding that the fraud

resulted in substantial financial hardship to more than 25 victims.

## II

Minhas argues that the district court incorrectly applied the § 2B1.1(b)(2) enhancement in both cases by relying on insufficient evidence, extrapolating from the evidence it did have, and aggregating the victims' economic characteristics. Minhas contends that in order to apply the enhancement, the district court should have made individualized determinations and identified the factual basis underlying the finding of substantial financial hardship to each victim. Because Minhas objected to the enhancement in each case at sentencing, we review for clear error the district court's factual determinations, and we consider *de novo* the appropriateness of the enhancement. *United States v. Harris*, 791 F.3d 772, 780 (7th Cir. 2015).

The Sentencing Guidelines provide for increased offense levels for crimes such as fraud that "result[] in substantial financial hardship" to victims. § 2B1.1(b)(2)(A)–(C). In addition to the text of the Guidelines, a court must also consider the Application Notes, which "are considered part of the Guidelines and not mere commentary on them." *United States v. Rogers*, 777 F.3d 934, 936 (7th Cir. 2015). Application Note 4 specifies that when determining whether an offense resulted in substantial financial hardship, a court "shall consider, among other factors," whether as the result of an offense a victim became insolvent; filed for bankruptcy; suffered a substantial loss of a retirement, education, or other savings or investment fund; made substantial changes to employment or living arrangements; or suffered substantial harm to the ability to obtain credit. § 2B1.1 cmt. n.4.

The enhancement for causing "substantial financial hardship" came into effect on November 1, 2015, as a result of amendments designed to "place greater emphasis on the extent of harm that particular victims suffer as a result of the offense." Sentencing Guidelines for United States Courts, 80 FR 25782-01 (May 5, 2015). Previously, § 2B1.1(b)(2) had provided for an enhancement for offenses that involved total numbers of victims over certain thresholds, or that were committed by the use of mass marketing, but it did not include any provision for whether the offense caused victims substantial financial hardship. See U.S.S.G. § 2B1.1(b)(2) (Nov. 2014). The effect of the 2015 amendment is to require the district courts, when they apply § 2B1.1(b)(2), to go beyond simply tallying the total number of victims (or deciding whether mass marketing was used), and to evaluate the substantiality of the financial hardship those victims suffered.

Because the amendments are relatively new, we have not yet had occasion to weigh in on the district courts' interpretation and application of the "substantial financial hardship" provision. The 2015 amendment to § 2B1.1(b)(2) introduces a measure of relativity into the inquiry. That is, whether a loss has resulted in a substantial hardship (or substantial loss to a savings account as in this case) will, in most cases, be gauged relative to each victim. The same dollar harm to one victim may result in a substantial financial hardship, while for another it may be only a minor hiccup. Much of this will turn on a victim's financial circumstances, as the district court recognized when it noted that "[a] loss that may not be substantial to Bill Gates may be substantial to a working person."

We recognize that reasonable people may disagree about the substantiality of a loss in a particular instance. The inclusion of the word "substantial" implies that the loss or hardship must be significant, meaning at least more than minimal or trivial. But between a minimal loss or hardship (occurring, perhaps, when a defendant fraudulently obtains five dollars a victim had intended to donate to a charity), and a devastating loss (occurring in the wake of a scheme to wipe out a victim's life savings), there lies a wide range in which we rely upon the judgment of the district courts, guided by the non-exhaustive list of factors in Application Note 4. In the end, this is just one more determination of a fact that bears on the ultimate sentence; that determination is entitled to the normal deference that applies to all facts found at sentencing. See, *e.g.*, *United States v. Parolin*, 239 F.3d 922, 926 (7th Cir. 2001) ("Determining whether a defendant's victims were 'unusually vulnerable' is a question of fact that is reversible only for clear error.").

Minhas urges that the district court committed clear error when it chose to consider the victims as a group rather than individually. In some instances, that would indeed pose a problem. It would be clear error for a district judge, for example, merely to divide a total loss amount by the number of victims without any information about the amount each individual victim suffered or the victim's financial circumstances. But that is not what happened here. This district judge carefully consulted a chart that listed each victim's individual losses. Inferring that each person was of modest economic circumstances, the judge then reasoned that losses above a certain threshold to each one were substantial.

A district court may draw reasonable inferences from the record. *United States v. Melendez*, 819 F.3d 1006, 1011 (7th Cir. 2016). Making an inference about an individual victim by virtue of his membership in a particular group is not necessarily problematic, so long as a district court has reason to believe that the victims are in similar economic circumstances. The question here is thus whether the court had sufficient evidence from which to infer that the victims were in similar economic positions.

In making its factual findings, a district court may draw conclusions from the testimony and evidence introduced at sentencing. *United States v. Halliday*, 672 F.3d 462, 475 (7th Cir. 2012). In the City Travel case, the district court indicated that he was doing just that, as he considered the evidence about Minhas's customer base. That evidence revealed that they were not rich and that they were looking for discounted tickets in a Pakistani-American newspaper. The court also indicated in the City Travel case that he was relying on the testimony of victims at sentencing and at trial, and on the submitted victim impact statements. These people reported saving for long times for their trips. In the Lightstar Hajj case, the court indicated it was relying on evidence from impact statements and testimony that victims had saved for long periods to go on the hajj, or that they had spent their life savings to do so.

While Minhas notes that much of the testimony was "conclusory" and lacked "verifiable facts," the evidentiary standards at sentencing are more relaxed than at trial, *United States v. Harmon*, 721 F.3d 877, 888 (7th Cir. 2013), and the district court is entitled to make credibility determinations about the witnesses and testimony presented. *United States v. Smith*, 308

F.3d 726, 746 (7th Cir. 2002). "[W]e require only that the information considered has sufficient indicia of reliability to support its probable accuracy." *United States v. Statham*, 581 F.3d 548, 553 (7th Cir. 2009).

In addition to numerous victims who testified about the amounts of time that it took them to save enough money for their trip, another victim who testified at sentencing indicated that he and others were from the same neighborhood, and that Minhas "took money from the poor people, hard-working people like [the victim]." The district court was familiar with victims who testified at trial and knew that Minhas's schemes tended to target those looking for discounted travel. And while looking for discounted travel alone does not imply that a person is not rich, it is at least some evidence that he or she is not so wealthy as to be purchasing luxury airfare or travel packages. One can imagine stronger evidence showing that the victims shared similar economic circumstances. But that does not mean that the district court erred by relying on what was in front of it when it concluded that it was more likely than not that the necessary number of victims in each case suffered a substantial financial hardship.

It is also worth noting that the district court understood that, at least in the Lightstar Hajj case, the harm was not just the loss of money, but was also a spiritual injury inflicted when it became impossible for the victim to make the hajj. The hajj is an annual pilgrimage to Islam's holiest site, Mecca, and making it is a religious duty to be performed at least once in a lifetime by every able-bodied Muslim who can afford the trip. See The Religion of Islam, The Fifth Pillar of Islam: The Pilgrimage (Hajj), at https://www.islamreligion.com/articles/184/fifth-pillar-of-islam/ (last visited Mar. 10, 2017); see

also Diaa Hadid, *What Muslims Do on Hajj, and Why*, The New York Times (Sep. 8, 2016), https://www.nytimes.com/2016/09/09/world/middleeast/hajj-muslim-pilgrimage-mecca.html. (Those who have made the pilgrimage are often given the title "Hajji", a term of respect.) While being deprived of this opportunity (for a year at the very least) may not constitute a financial loss in the traditional sense of losing dollars from a bank account, it is a significant alteration in life circumstances, as are many of the factors pertinent to interpreting "substantial financial hardship" that can be found in a non-exhaustive list in Application Note 4(F), such as making changes to employment or retirement plans or altering one's housing situation. The existence of this loss reinforces the district court's ultimate choice of sentence.

Minhas further argues that the district court ought to have identified which of the particular victims it was including in its calculation, rather than concluding that at least a certain number of those on the list met the threshold. While listing each individual victim he was including to meet each threshold would have been helpful, it is not an end in itself. We look at the record as a whole, and in this case it is adequate.

### III

We are bolstered in our decision to affirm Minhas's sentence because we are convinced that any error that may have crept into the sentencing proceeding was harmless. Though a district court must seriously consider and carefully apply the Sentencing Guidelines, they are, in the end, only guidelines; sentencing is the responsibility of the district judge after careful consideration of the § 3553(a) factors. *United States v. Lopez*, 634 F.3d 948, 953–54 (7th Cir. 2011). Procedural errors do not warrant remand when we are convinced that returning the

case to the district court would result in the same sentence. *United States v. Abbas*, 560 F.3d 660, 667 (7th Cir. 2009). We acknowledge that "[a] finding of harmless error is only appropriate when the government has proved that the district court's sentencing error did not affect the defendant's substantial rights (here—liberty)." *Id.* Nonetheless, "[a]n error in calculating the Guideline range can still be harmless where the district judge makes clear that the sentence would have been the same absent the error." *United States v. Tate*, 822 F.3d 370, 377 (7th Cir. 2016). We have suggested that when a district court faces a "tricky but technical issue" under the Guidelines, it should exercise its discretion under § 3553(a) and *United States v. Booker*, 543 U.S. 220 (2005) and spell out whether the resolution of the guideline issue matters or affects the final decision on the sentence. *Lopez*, 634 F.3d at 954.

The district court was aware that it could let the parties and the reviewing court know whether it would have given Minhas the same sentence if it had agreed with him on the guidelines issue. While the judge's initial statement was somewhat inconclusive—he began by stating "I *can't* say that I would have imposed the same 9-1/2 year sentence … "(emphasis added)—he then discussed the seriousness of the offense and aggravating factors. He noted that he "would have imposed sentences at the upper end of those Guideline ranges [proposed by Minhas]" and that he "would have made less of [the sentence] concurrent and more of it consecutive." This suggests to us that perhaps the judge simply misspoke when he said "can't" instead of "can."

In any event, the court finally concluded, "[t]his is a serious crime, and as I said, taking into account everything and even putting aside the technical calculation of the Guidelines

range, I don't think anything less than 9-1/2 years would be sufficient to fulfill the purposes of 3553(a)." This is a firm statement that after all was said and done, the court thought that a 9-1/2 year sentence was the correct one for Minhas. That is what the court ordered, and any error buried in the weeds of the Guidelines was thus harmless.

The judgments of the district court are AFFIRMED.