**NOT RECOMMENDED FOR FULL-TEXT PUBLICATION**
File Name: 18a0443n.06

**Nos. 17-3413/17-3454**

UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

UNITED STATES of AMERICA,

      Plaintiff-Appellee,

v.

CHRISTOPHER J. HOWDER and
JASON J. KEATING,

      Defendants-Appellants.

**FILED**
Aug 27, 2018
DEBORAH S. HUNT, Clerk

ON APPEAL FROM THE UNITED
STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF OHIO

BEFORE:     SUHRHEINRICH, CLAY, and GIBBONS, Circuit Judges.

**CLAY, Circuit Judge.** Defendants Christopher J. Howder and Jason J. Keating pleaded guilty to numerous counts of mail and wire fraud, in violation of 18 U.S.C. § 1341, 18 U.S.C. § 1343, and 18 U.S.C. § 1349. Howder was sentenced to 84 months' imprisonment. Keating was sentenced to 108 months' imprisonment. Both defendants appeal their sentences. For the reasons set forth below, we **AFFIRM** Defendants' sentences.

## BACKGROUND

### Factual Background

In March 2009, the federal government launched the Home Affordable Modification Program ("HAMP") to provide mortgage lenders with financial incentives to help distressed homeowners stay in their homes. In 2011, Jason Keating invited his old friend Christopher Howder to be the "underwriting manager" at an operation called "Making Homes Affordable

USA" ("MHAUSA"), which was operated primarily out of Toledo, Ohio. Keating was the self-described "President" of this operation.

Keating, Howder, and others presented themselves as people who could assist distressed homeowners in obtaining loan modifications that would reduce homeowners' monthly mortgage obligations. MHAUSA ran an "origination strategy" called the "Home Saver Program," under which clients were directed to deposit their mortgage payments into an escrow account at MHAUSA and "were told this money was to be used for modification purposes for any arrearages that needed to be paid prior to approval." (R. 106, Howder Change of Plea Tr., PageID # 3800.) But MHAUSA did not help distressed homeowners; it exploited them.

The scheme was to "convinc[e] at risk home owners to submit their mortgage payments to Keating's escrow account without telling the home owners there was no escrow account and the funds were for personal use." (R. 80, Howder Sent. Mem., PageID # 2038.) Eventually, Howder broke with Keating, but he continued serving his own clients in the same manner, asking them to make payments into an "escrow fund," that was, in truth, a bank account from which he made daily cash withdrawals to fund his $250-$300/day OxyContin habit.

**Procedural History**

On March 5, 2015, Howder and Keating were each charged with one count of wire fraud, in violation of 18 U.S.C. § 1344, in connection with the home mortgage remodification business in which they both participated. Shortly thereafter, on April 2, 2015, the government filed a Superseding Indictment, charging Keating and Howder with 34 counts, alleging various fraud offenses. Count 1 charged both defendants with conspiracy to commit mail and wire fraud, in violation of 18 U.S.C. § 1349, 18 U.S.C. § 1341, and 18 U.S.C. § 1343; Counts 3, 4, and 6 charged both defendants with mail fraud, in violation of 18 U.S.C. § 1341; and Counts 21–26 charged both

defendants with wire fraud, in violation of 18 U.S.C. § 1343. Additionally, Keating was charged individually in Counts 2, 5, 7, 8, 11–16, 18, and 19 with mail fraud and in Counts 27–34 with wire fraud. And Howder was charged individually in Counts 9, 10, and 17 with mail fraud and in Count 20 with wire fraud.

Both defendants pleaded guilty without a plea agreement. On April 18, 2016, Howder pleaded guilty to all 14 counts with which he was charged, including one count of Conspiracy to Commit Mail & Wire Fraud, 6 counts of Mail Fraud, Aiding & Abetting, and 7 counts of Wire Fraud, Aiding & Abetting. He was referred to the probation office for the preparation of a Presentence Investigation Report ("PSR"). Howder submitted objections to the initial draft PSR on October 19, 2016. Specifically, Howder objected to the scope of the jointly undertaken criminal activity reflected in the PSR and its effect on calculating the loss amount, as relevant to the application of USSG § 2B1.1(b)(1) enhancements. He further objected to the application of USSG § 2B1.1(b)(2)(C), an enhancement applied when twenty-five or more victims suffered substantial financial hardship.

As for Keating, he ultimately pleaded guilty to 26 of the 30 counts with which he was charged, including one count of Conspiracy to Commit Mail and Wire Fraud, 12 counts of Mail Fraud, Aiding & Abetting, and 13 counts of Wire Fraud, Aiding & Abetting. He was also referred to the probation office for the preparation of a PSR.

On October 24, 2016, the district court held a hearing to address Defendants' objections to their PSRs. Both defendants objected to the loss amount attributed to them for the period of joint activity and to the proposed six-level enhancement for 25 or more victims incurring substantial financial hardship. On December 5, 2016, the court held a second hearing to address these objections and take victim impact statements. The government presented nine victims, two

of whom appeared in person and made verbal statements and seven who appeared via telephone. Three victims said that both Keating and Howder were the points of contact for their mortgage loan remodifications that were part of the scheme to defraud charged in this case. Three other victims stated that Keating alone was their main contact for their loan remodifications. In addition to receiving the victim impact testimony and addressing sentencing enhancements, the court discussed restitution and ordered the preparation of final PSRs. At the conclusion of this hearing, the judge advised counsel for Defendants that he would strongly consider a six-level enhancement for each defendant pursuant to USSG § 2B1.1(b)(2)(C) because the fraudulent activity resulted in substantial financial hardship for 25 or more victims.

On February 28, 2017, final PSRs were submitted for Howder and for Keating. The reported offense conduct alleged that Howder and Keating were primary conspirators in the mortgage loan remodification scheme that ran from 2010 to 2015. The PSRs calculated the guideline ranges for both defendants as follows: 7 levels for the base offense (USSG § 2B1.1), plus 16 levels for a total loss amount of $1,842,894.87 (USSG § 2B1.1(b)(1)(I)), plus 6 levels for offense conduct that resulted in substantial financial hardship to 25 or more victims (USSG § 2B1.1(b)(2)(C)), resulting in a total offense level of 29. After deducting 3 levels for acceptance of responsibility, the total offense level for each defendant was 26. Keating's criminal history was a Category III, resulting in a guideline range of 78–97 months. Howder's criminal history was a Category IV, making his guidelines range 92–115 months.

Both Keating and Howder filed Sentencing Memoranda continuing to object to the PSR's loss calculation and substantial financial harm enhancement. Howder's Sentencing Memorandum also maintained his objection to the scope of the jointly undertaken criminal activity alleged in the PSR, citing witness interviews that, he claims, "barely mentioned Mr. Howder or did not mention

him at all." (Brief for Appellant Howder at 7–8 (citing R. 80, Howder Sent. Mem., PageID # 2033, 2038–2039; R. 81, Sealed Exhibits, Ex. E, F, and G).) His memorandum also focused on his recovery from an extensive OxyContin habit and his successful maintaining of a job at a home remodeling company. In Keating's memorandum, he objected to receiving a Criminal History Category of III, arguing that a Category of II was more appropriate because one of the convictions counted in the original calculation had been vacated and amended since the drafting of the original PSR. The government filed a Sentencing Memorandum with respect to Keating but did not file one for Howder.

On April 3, 2017, the court held Howder's sentencing hearing. At the hearing, the government agreed that the revised loss amount of $561,862.80, attributed solely to Howder, reflected a 14-level enhancement under § 2B1.1(b)(1)(H), reducing his total offense level from 26 to 24. Combined with a Criminal History Category of IV, Howder's sentence range was 77–96 months. Howder objected to this calculation, arguing that the court should have applied a 4-level enhancement under USSG § 2B1.1(b)(2)(B), instead of the 6-level enhancement under § 2B1.1(b)(2)(C). At issue was the number of victims attributable to Howder's conduct for which the court could find evidence of "serious financial harm." After hearing argument from both sides, the court found that the six-level enhancement applied and noted Howder's objection. The court then sentenced Howder to a within-Guidelines sentence of 84 months on each count, to be served concurrently. The court said of Howder's conduct that it was "morally reprehensible to an almost unimaginable degree," and cited the vulnerability of the victims, the sanctity of the home, and the need for punishment and deterrence as reasons for applying a sentence toward the middle of the guidelines range. (R. 105, Howder Sent. Tr., PageID # 3766–69.) The court also ordered Howder to pay $587,799.80 in restitution.

On April 4, 2017, the court held a sentencing hearing for Keating.  The court granted Keating's request to reduce his Criminal History Category to II.  This brought him to a guidelines range of 70–87 months.  The court then applied a "substantial upward variance," based in part on its determination that Keating was "the defacto [sic] leader of this operation."  (R. 112, Keating Sent. Tr., PageID # 4005.)  The court sentenced Keating to 108 months on each count, to be served concurrently.  Keating was also ordered to pay $1,183,025.88 in restitution.

On April 21, 2017, Howder timely filed a Notice of Appeal.  On April 28, 2017, Keating did the same.

## DISCUSSION

### I. The district court correctly applied § 2B1.1 to enhance Howder's sentence.

#### Standard of Review

"In reviewing a district court's application of the Sentencing Guidelines, this Court will 'accept the findings of fact of the district court unless they are clearly erroneous and [will] give due deference to the district court's application of the Guidelines to the facts.'"  *United States v. Sexton*, 894 F.3d 787, 793 (6th Cir. 2018) (alteration in original) (quoting *United States v. Moon*, 513 F.3d 527, 539–40 (6th Cir. 2008)).  "Under the clear-error standard, we abide by the court's findings of fact unless the record leaves us with the definite and firm conviction that a mistake has been committed."  *Id.* at 794 (quoting *United States v. House*, 872 F.3d 748, 751 (6th Cir. 2017)).  "We review a district court's legal conclusions regarding the Sentencing Guidelines *de novo*."  *Id.* at 793 (quoting *Moon*, 513 F.3d at 540).

#### Analysis

Howder challenges the district court's application of the § 2B1.1 enhancement to his criminal sentence.  He argues that the record supports only a finding that, at most, seventeen of his

victims suffered substantial financial hardship.  Therefore, he argues, the Court should not have applied a 6-level enhancement, under USSG § 2B1.1(b)(2)(C), for causing substantial financial hardship to twenty-five or more victims.  Instead, he argues, the court should have applied a 4-level enhancement, under § 2B1.1(b)(2)(B), for causing substantial financial harm to only five or more victims.

Section 2B1.1 of the Guidelines provides for increased offense levels for economic crimes that "result[ ] in substantial financial hardship" to victims.  USSG § 2B1.1(b)(2)(A)–(C).  "This enhancement is a recent addition to the Guidelines that took effect on November 1, 2015." *United States v. Poulson*, 871 F.3d 261, 267 (3d Cir. 2017).  "It advises sentencing courts to consider the extent of the harm rather than merely the total number of victims of the offense (as its predecessor did) in an effort to 'place greater emphasis on the extent of harm that particular victims suffer as a result of the offense.'" *Id.* (quoting Sentencing Guidelines for the United States Courts, 80 Fed. Reg. 25,782, 25,791 (May 5, 2015)).  "The newly amended § 2B1.1 is thus '[c]onsistent with the Commission's overall goal of focusing more on victim harm' and 'ensures that an offense that results in even one victim suffering substantial financial harm receives increased punishment, while also lessening the cumulative impact of loss and the number of victims, particularly in high-loss cases.'" *Id.* (quoting United States Sentencing Commission, *Guidelines Manual*, Supplement to Appendix C 112–13 (Nov. 1, 2015)).

Although § 2B1.1 "effect[ed] a substantive change" to the Guidelines, *United States v. Jesurum*, 819 F.3d 667, 672 (2d Cir. 2016), our Court has not yet had the opportunity to consider it, and the challenge to its application presents us with a question of first impression.  Despite the dearth of case law, Application Note 4(F) offers instructive commentary that sentencing courts are required to consider when applying § 2B1.1.  *See United States v. Young*, 266 F.3d 468, 475 n.7

(6th Cir. 2001) ("Sentencing courts are directed by statute, *see* 18 U.S.C. § 3553, to follow official commentary, which includes application notes, of the Sentencing Commission in order to, among other things, 'interpret the guideline or explain how it is to be applied.'" (quoting USSG § 1B1.7)).

Application Note 4(F) provides as follows:

> In determining whether the offense resulted in substantial financial hardship to a victim, the court shall consider, *among other factors*, whether the offense resulted in the victim—
>
> (i)      becoming insolvent;
> (ii)     filing for bankruptcy under the Bankruptcy Code . . . ;
> (iii)    suffering substantial financial loss of a retirement, education, or other savings or investment fund;
> (iv)     making substantial changes to his or her employment, *such as* postponing his or her retirement plans;
> (v)      making substantial changes to his or her living arrangements, *such as* relocating to a less expensive home; and
> (vi)     suffering substantial harm to his or her ability to obtain credit.

USSG § 2B1.1(b)(2) cmt. n.4 (emphasis added).

Turning to Howder, an unobjected-to portion of Howder's PSR reflects that there were 161 victims attributable to his conduct, either individually or in participation with others. Of those 161 victims, only some prepared victim impact statements. Indeed, of the 318 total victims of this scheme, only 69 prepared statements. Howder claims to have combed through these 69 prepared statements, "resolv[ed] any uncertainty in favor of a finding of substantial financial hardship," and reached a final tally of only 17 qualifying victims. (Brief for Howder at 19.)

Howder therefore argues that the district court arrived at a number of twenty-five or more qualifying victims only by "presum[ing] substantial financial hardship without requiring preponderant proof." (Brief for Howder at 17.) At sentencing, the district court stated as follows:

> THE COURT: And I agree on the substantial harm issue. I should have made that clear earlier, I suppose. Hey, these are people in serious and desperate financial straits. They don't try to get a loan modification in case that [sic] either are or perceive that they may be under risk of not being able to pay foreclosure and loss

of their home. And then people take the money and put it in their own pockets instead of doing what they promised it would do. I have no doubt that the substantial harm enhancement is entirely appropriate.

(R. 105, Howder Sent. Tr., PageID # 3745.) Further, the court agreed with the government that making mortgage payments to Howder and Keating, instead of to their mortgagees, put victims at "substantial risk of loan foreclosure proceedings" and that "[a] lot of people that stopped paying the mortgages . . . lost all those months of payments and had them added on even if they did have an opportunity to refinance the mortgage." (R. 105, Howder Sent. Tr., PageID # 3748–49.) Howder asserts that "[t]his line of reasoning assumes all victims were in or near home foreclosure, not simply looking for a better interest rate or inquiring regarding mortgages on investment properties." (Brief for Howder at 18.)

We conclude that the district court committed no error in drawing reasonable inferences about the financial position of victims who sought mortgage relief in the aftermath of the 2008 financial crisis. Moreover, the district court's decision is supported by the relatively few courts to have applied the amended § 2B1.1(b)(2) enhancements.

In *United States v. Minhas*, the Seventh Circuit explained that the "2015 amendment to § 2B1.1(b)(2) introduces a measure of relativity into the inquiry. That is, whether a loss has resulted in a substantial hardship . . . will, in most cases, be gauged relative to each victim." 850 F.3d 873, 877 (7th Cir. 2017). Further, "[m]uch of this will turn on a victim's financial circumstances, as the district court recognized when it noted that '[a] loss that may not be substantial to Bill Gates may be substantial to a working person.'" *Id.* at 877–78. The court explained as follows:

> The inclusion of the word 'substantial' implies that the loss or hardship must be significant, meaning at least more than minimal or trivial. But between a minimal loss or hardship (occurring, perhaps, when a defendant fraudulently obtains five dollars a victim had intended to donate to a charity), and a devastating loss

(occurring in the wake of a scheme to wipe out a victim's life savings), there lies a wide range in which we rely upon the judgment of the district courts, guided by the non-exhaustive list of factors in Application Note 4. In the end, this is just one more determination of a fact that bears on the ultimate sentence; that determination is entitled to the normal deference that applies to all facts found at sentencing.

*Id.* at 878.

Applying this reasoning, the Seventh Circuit held that the district court did not err by "[i]nferring that each [victim] was of modest economic circumstances" and finding that "losses above a certain threshold to each one were substantial." *Id.* Indeed, the court held that "[m]aking an inference about an individual victim by virtue of his membership in a particular group is not necessarily problematic, so long as a district court has reason to believe that the victims are in similar economic circumstances." *Id.* In *Minhas*, "[t]he district court was familiar with victims who testified at trial and knew that Minhas's schemes tended to target those looking for discounted travel." *Id.* at 879. "And while looking for discounted travel alone does not imply that a person is not rich, it is at least some evidence that he or she is not so wealthy as to be purchasing luxury airfare or travel packages." *Id.* The Seventh Circuit held that targeting victims pursuing discount travel was "at least some evidence" that the victims were particularly susceptible to financial harm; the case is even stronger for victims who are actively pursuing mortgage remodifications.

Next, in *United States v. Poulson*, the defendant challenged his sentence for mail fraud related to his operation of a scheme whereby he "tricked homeowners facing foreclosure into selling him their homes and then engaged in a multi-million-dollar Ponzi scheme that defrauded investors in those distressed properties." 871 F.3d 261, 264 (3d Cir. 2017). The Third Circuit also recognized the relativity introduced by the § 2B1.1(b)(2) enhancements and explained that "this 'measure of relativity' does not require the sentencing court to identify finite dollar amounts . . . . To the contrary, it is axiomatic that sentencing courts may draw reasonable inferences from the

factual record before them." *Id.* at 268–69. The court further explained that "[w]hen applying the term [substantial] to financial hardship in the sentencing context . . . we ought to consider not only the pecuniary value of the loss but also such intangibles as its impact on the victim." *Id.* at 269. The court therefore held that the district court did not err by "t[aking] direct account of the impact of each victim's loss on his or her overall financial health and appropriately us[ing] its discretion to infer the magnitude of financial hardship based on the actions each victim was forced to take as a result." *Id.* at 268 n.6.

In sum, these cases stand for the proposition that a sentencing court may make reasonable inferences about the victims' financial circumstances and about their level of financial harm, so long as those inferences find some support in the record. In the instant case, the district court inferred that at least twenty-five of Howder's 161 victims suffered substantial financial harm. Howder admits that 17 of the 69 victim impact statements demonstrate such harm. And he further acknowledged that his victims were "at risk home owners." (R. 80, Howder Sent. Mem., PageID # 2038.) Given the likely financial circumstances of each of these "at risk homeowners," given further that each of these 161 victims share the characteristic of having sought out MHAUSA's services in order to refinance their mortgage payments, and, finally, given that Howder was hitting them at precisely the point he knew they were most vulnerable—their mortgage payments, we hold that the district court did not clearly err by finding it more probable than not that at least twenty-five of Howder's victims suffered substantial financial harm.

## II.  Howder's 84-month sentence is procedurally and substantively reasonable.

Howder also challenges his 84-month sentence as both procedurally and substantively unreasonable. He asserts that his sentence is procedurally unreasonable because: (1) his guideline offense level was incorrectly calculated, (2) the reasons for the sentence were not adequately

articulated, and (3) the court "relied on unresolved and erroneous facts to fashion the sentence." (Brief for Appellant Howder at 12.) He contends that his sentence was substantively unreasonable because "the sentencing court put disproportionate weight on one sentencing factor and minimized or disregarded others." (*Id.*) He therefore asks us to remand for resentencing.

**Standard of Review**

"This Court reviews sentencing decisions deferentially for abuse of discretion." *Sexton*, 894 F.3d at 796 (citing *Gall v. United States*, 552 U.S. 38, 41 (2007)).

**Analysis**

We review a criminal sentence for reasonableness. *Id.* (citing *United Sates v. Payton*, 754 F.3d 375, 377 (6th Cir. 2014)). "This review has two components: procedural reasonableness and substantive reasonableness." *United States v. Solano-Rosales*, 781 F.3d 345, 351 (6th Cir. 2015). We begin by "ensur[ing] that the district court committed no significant procedural error, such as failing to calculate (or improperly calculating) the Guidelines range, treating the Guidelines as mandatory, failing to consider the § 3553(a) factors, selecting a sentence based on clearly erroneous facts, or failing to adequately explain the chosen sentence—including an explanation for any deviation from the Guidelines range." *Gall*, 552 U.S. at 51.

We then review the substantive reasonableness of the sentence, "tak[ing] into account the totality of the circumstances, including the extent of any variance from the Guidelines range." *Id.* "To be substantively reasonable, the sentence 'must be proportionate to the seriousness of the circumstances of the offense and offender, and sufficient but not greater than necessary, to comply with the purposes of § 3553(a).'" *Sexton*, 894 F.3d at 797 (citation and internal quotation marks omitted) (quoting *United States v. Vowell*, 516 F.3d 503, 512 (6th Cir. 2008)). "A sentence may be considered substantively unreasonable when the district court selects a sentence arbitrarily,

bases the sentence on impermissible factors, fails to consider relevant factors, or gives an unreasonable amount of weight to any pertinent factor." *Id.* (quoting *United States v. Conaster*, 514 F.3d 508, 520 (6th Cir. 2008)). We "afford[] a rebuttable presumption of reasonableness to a properly calculated, within-Guidelines sentence." *Id.* (quoting *United States v. Graham*, 622 F.3d 445, 464 (6th Cir. 2010)).

### 1. Procedural Reasonableness

Howder first argues that his offense level of 24 was incorrectly calculated by the trial court. The basis for this argument, however, is his claim that the district court should have applied the 4-level enhancement under USSG § 2B1.1(b)(2)(B), instead of the 6-level enhancement under USSG § 2B1.1(b)(2)(C).  Given our conclusion in the previous section that the district court did not err by applying the 6-level enhancement in USSG § 2B1.1(b)(2)(C), this argument fails.

Howder next argues that the district court failed to adequately explain its reasons for rejecting his arguments in mitigation.  He asserts that "[t]he trial court dismissed [his] arguments with no real explanation." (*See* Brief for Howder at 20.)  But the district court did consider his mitigation arguments; it just did not find them overriding.  After pronouncing its sentence, the court explained its reasoning and directly addressed Howder's arguments and the § 3553(a) factors:

> The reasons for my sentence, the Section 3553(a) factors . . . this conduct, regardless of the occasion for its occurrence, nonetheless is, at its core, morally reprehensible to an almost unimaginable degree . . . upon consideration of the kinds of offenses that you committed and the frequency with which you committed them and the extent to which you profited . . . a purpose of the sentence is to punish you in a way that I think society would find to be just and appropriate . . . this is a sentence that is sufficient but not greater than necessary to accomplish that purpose of sentencing . . . .
>
> Also, significantly, I believe, the public deterrent effect. . . . And . . . the serious nature of the offense and the harm that was caused.  I have taken into consideration the efforts you have made while on pretrial release to become and remain sober, to

obtain and maintain employment, lawful employment, to support those to whom you owe support, and as well in however modest of way to undertake to make some modest restitution on your own . . . but nonetheless, the fundamental reason that I'm imposing a very severe sentence, less than I was contemplating, but nonetheless very severe, . . . is simply because of the nature of the criminal activity, the frequency of it, and the consequences that it inflicted not just upon those people, relatively small number of people who have filed victim impact statements, but also overall in terms of the victims, whether they've responded to that opportunity or not.

(R. 105, Howder Sent. Tr., PageID # 3766–69.)

In reviewing the district court's application of the § 3553(a) factors, "there is no requirement . . . that the district court engage in a ritualistic incantation to establish consideration of a legal issue," or that it "make specific findings related to each of the factors considered." *United States v. Bolds*, 511 F.3d 568, 580 (6th Cir. 2007) (internal quotation marks and citation omitted). That the district court weighed Howder's mitigation arguments and still applied a sentence toward the middle of the Guidelines' range does not mean that it failed to consider his mitigation arguments. Therefore, Howder's argument fails.

Howder's final procedural reasonableness claim is that the district court relied on "unresolved disputed facts to impose sentence." (Brief for Howder at 21.) According to him, the district court conflated his personal conduct with the conduct of Keating and of the entire conspiracy. He claims that "[t]hroughout the proceedings below, Mr. Howder maintained that, despite the assertions of the pre-sentence report and, to a lesser extent, the Government, the scope of his jointly undertaken criminal conduct with Mr. Keating and the others was limited [to] three months in 2010 and six months in 2011." (*Id.*) Nonetheless, he claims, "the pre-sentence report reads like Mr. Howder and Mr. Keating were joined at the hip for five years." (*Id.* at 23.) Of particular offense to Howder seems to be the PSR's characterization of Howder and Keating as the "primary conspirators" in the mortgage loan remodification scheme. (*Id.*) He claims that he

14

"never wrote any employee handbooks, did not hire or fire anyone, did not create forms, did not conduct meetings or supervise anybody . . . . did not have a[n] office or even a desk at any of Mr. Keating's locations." (*Id.* at 23–24.) Thus, "[t]he characterization in the pre-sentence report of Mr. Howder as a primary lead conspirator with Mr. Keating is erroneous and misleading, and the Court was clearly misled." (*Id.* at 24.)

The problem for Howder is that the district court did clearly distinguish between Keating and Howder. Indeed, that distinction was the basis stated for the court's decision to apply a within-Guidelines sentence:

> Okay. I'll be very candid with you, coming in here I was quite seriously anticipating a variance upward in the guideline range. I know that I've heard what you said about Keating Howder, Howder Keating, they were not a partnership. I get that, but it was worthwhile that you underscored that. I'm going to impose a sentence within the guideline range.

(R. 105, Howder Sent. Tr., PageID # 3761–62.) Further, the PSR identified the limited timeframe of Howder's involvement, stating that he worked with Keating in 2010 and from approximately June 2011 until November 2011. And the court found that Howder's involvement in the scheme was limited to the tune of approximately $550,000 in losses to the victims, not the entire $1.8 million that the defendants received from the entire scheme.

Finally, there is nothing in the record to indicate that the district court placed any undue weight on Howder's role in the scheme by attributing another person's conduct to Howder. Indeed, it is revealing that despite Howder's claim that the district court was misled into thinking that Howder was one of the "lead conspirators," the district court applied a substantial upward variance when sentencing Keating in recognition that he was "the defacto [sic] leader of this operation," (R. 112 Keating Sent. Tr., PageID # 4005), but it did not apply the same variance to Howder.

Thus, Howder's claims of procedural unreasonableness are without merit.

## 2. Substantive Reasonableness

The district court sentenced Howder toward the middle of the Guidelines range after explicitly mentioning and reviewing a number of § 3553(a) factors and after considering and rejecting Howder's mitigation arguments. The crux of Howder's substantive reasonableness claim is that the district court placed "disproportionate weight . . . on victim impact." (Brief for Howder at 26.) He also rehashes his prior arguments that the district court did not give enough weight to his mitigation arguments, including the arguments that he voluntarily offered $14,500.00 in restitution and that he was recovering from an expensive OxyContin habit. However, "the manner in which a district court chooses to balance the applicable sentencing factors is beyond the scope of the Court's review." *United States v. Adkins*, 729 F.3d 559, 571 (6th Cir. 2013) (citing *United States v. Norman Sexton*, 512 F.3d 326, 332 (6th Cir. 2008); *United States v. Ely*, 468 F.3d 399, 404 (6th Cir. 2006)). And "where a district court explicitly or implicitly considers and weighs all pertinent factors, a defendant clearly bears a much greater burden in arguing that the court has given an unreasonable amount of weight to any particular one." *Id.* (alteration omitted) (quoting *United States v. Thomas*, 437 F. App'x 456, 458 (6th Cir. 2011)). The district court considered all of the relevant § 3553(a) factors, including the nature and severity of the offense; the need for public deterrence, to provide just punishment, and to protect the public; as well as Howder's history and characteristics. Moreover, the district court explained that its consideration of Howder's mitigation arguments was the reason it decided against varying upward, something it was initially inclined to do.

Considering the totality of the circumstances, the district court did not place unreasonable weight on any one of the sentencing factors, and Howder therefore fails to overcome the presumption that his within-Guidelines sentence is reasonable.

**III.     Keating's 108-month sentence is procedurally and substantively reasonable.**

**Standard of Review**

"This Court reviews sentencing decisions deferentially for abuse of discretion."  *Sexton*, 894 F.3d at 796 (citing *Gall*, 552 U.S. at 41).  We review a criminal sentence for reasonableness. *Id.* (citing *Payton*, 754 F.3d at 377).  "This review has two components: procedural reasonableness and substantive reasonableness."  *Solano-Rosales*, 781 F.3d at 351.  We begin by "ensur[ing] that the district court committed no significant procedural error, such as failing to calculate (or improperly calculating) the Guidelines range, treating the Guidelines as mandatory, failing to consider the § 3553(a) factors, selecting a sentence based on clearly erroneous facts, or failing to adequately explain the chosen sentence—including an explanation for any deviation from the Guidelines range."  *Gall*, 552 U.S. at 51.  Unpreserved procedural reasonableness challenges are subject to plain error review.  *United States v. Davis*, 751 F.3d 769, 773 (6th Cir. 2014).

We then review the substantive reasonableness of the sentence, "tak[ing] into account the totality of the circumstances, including the extent of any variance from the Guidelines range." *Gall*, 552 U.S. at 51.  "To be substantively reasonable, the sentence 'must be proportionate to the seriousness of the circumstances of the offense and offender, and sufficient but not greater than necessary, to comply with the purposes of § 3553(a).'"  *Sexton*, 894 F.3d at 797 (quoting *Vowell*, 516 F.3d at 512).  "A sentence may be considered substantively unreasonable when the district court selects a sentence arbitrarily, bases the sentence on impermissible factors, fails to consider relevant factors, or gives an unreasonable amount of weight to any pertinent factor."  *Id.* (quoting *Conaster*, 514 F.3d at 520).

**Analysis**

Keating's primary argument is that the district court erroneously applied USSG § 3B1.1's leadership enhancement, characterized as an upward variance. He argues that this makes his sentence procedurally unreasonable because the court did not give the prior notice required under Federal Rule of Criminal Procedure 32,[1] leaving counsel without the means to present an argument against the enhancement. Keating concedes that he failed to raise this argument before the district court and that it is therefore subject to plain-error review. To find plain error, this Court must find "(1) error (2) that 'was obvious or clear,' (3) that 'affected defendant's substantial rights,' and (4) that 'affected the fairness, integrity, or public reputation of the judicial proceedings.'" *United States v. Vonner*, 516 F.3d 382, 386 (6th Cir. 2008) (en banc) (quoting *United States v. Gardiner*, 463 F.3d 445, 459 (6th Cir. 2006)). Keating also challenges his sentence as substantively unreasonable.

Section 3B1.1(a) of the Sentencing Guidelines mandates a 4-point offense-level increase "[i]f the defendant was an organizer or leader of a criminal activity that involved five or more participants or was otherwise extensive." USSG § 3B1.1(a). Early in Keating's sentencing proceedings, the district court asked counsel whether this guideline should apply:

> Let's turn to an issue that is troublesome to me. Why shouldn't there be an enhancement – let me ask you, [government counsel], first. Do you think there should be an enhancement for his leadership, organization and managerial role in this case? If not, that's fine I'll move on. If so, let me know what you think.

(R. 112, Keating Sent. Tr., PageID # 3976.) The government responded that the facts would support such a finding. The court then asked Keating's counsel, who responded as follows:

> Your Honor, neither the initial disclosure nor the final disclosure of the PSR suggested an enhancement for being a leader or organizer, and if the Court is going to consider that, I'd ask for a continuance of this matter so that the defense can

---

[1] Federal Rule of Criminal Procedure 32(d)(1)(A) requires that a presentence report "identify all applicable guidelines and policy statement of the Sentencing Commission." Fed. R. Crim. P. 32(d)(1)(A).

> huddle up and brief that issue. It's pretty clear from – I'm new to the table in this case. I got involved on behalf of Mr. Keating –
> THE COURT: I understand.
> -- after his plea and after he met with Ms. Sizemore, but I'm, you know, still just getting a grasp on the details. . . . So again, I would dissuade The Court from considering an enhancement for being a leader organizer and ask The Court to take that into consideration also when you determine a final loss amount in relation to Mr. Keating's criminal culpability here.

(*Id.* at PageID # 3977–78.)

Ultimately, the court declined to apply the leader enhancement under USSG § 3B1.1(a), seemingly because the government had failed to request it. When it came time to pronounce Keating's sentence, however, the court applied a "substantial upward variance" based in part on the finding that Keating was "the defacto [sic] leader of this operation." (R. 112 Keating Sent. Tr., PageID # 4003–05.)

A sentencing court is not required to give prior notice before applying a variance from the Guidelines range. *See United States v. Coppenger*, 775 F.3d 799, 803 (6th Cir. 2015) (citing *Irizarry v. United States*, 553 U.S. 708, 714–15 (2008)). Keating argues that the district court's decision to vary upward was procedurally improper insofar as it was "an adjustment/enhancement clothed in a thin veil of 'variance.'" (Brief for Keating at 14.) The problem for Keating is that the district court's upward variance was based only in small part on his leadership role. Indeed, the court explained its decision to "vary upward substantially from the guidelines" as follows:

> I have considered the Section 3553(a) factors. Without going on too long about it because I think I've made my views clear about the offenses that you committed and how serious they were, how reprehensible they were, how unnecessary they were, how devastating they were. To me it is unimaginable that 268 families were put at risk – who were at risk, had that risk enhanced probably greatly enhanced because you stole the money and applied it for your own use and purposes when they anticipated that you would do everything you possibly could to make certain that they could stay in their homes. The $5,600 you spent on a Louis Vuitton bag because you thought some woman ought to be well cared for, perhaps it was that $5,600 that put a family in a street because you cared more for tending to the

impulsive needs, desires of a companion than you did of a family to whom you owed a much greater obligation.

The numbers of victims, at least 1/3 more than those of Mr. Howder. The profit. I believe I gave him an 84 month sentence, and he did have a more serious criminal history, I know that, and that factored into my decision yesterday. But you put twice the amount of money he did into your pocket while stealing from 1/3 more victims. And in an astonishing way, truly astonishing way, you kept right on doing what you were doing. No lawyer told you to keep doing what you were doing, running your business, sure, but continuing to steal $50,000 into a bank account a month after the FBI showed up. You know, that shows impulse or self grandiment [sic], self protection, self enrichment and self enhancement that is truly amazing and [] incomprehensible.

And finally, I am taking into account the fact that you were the defacto leader of this operation. You helped assemble the Keating Group, which I understand from time to time it was referred to as. They all operated under the Making Homes Affordable USA, which itself the very title mimicking the federal legislation that was intended to relieve the distress caused by the greater recession and the near collapse of the American financial institution Making Homes Affordable USA. That itself, the mere title of it, it contains an indication of the deceit that permeated your entire operation.

And truly at the end of the day, what seems to me to justify a very substantial upward variance from the guidelines, which is something I rarely do, is, again, the cumulative effect upon literally hundreds of people. It wasn't just the person on the note or the person who sent you the check. It was the families, those who lived under the same roof. Whether or not they got put into the street, and I have no doubt some did, if not many did, but every single one of those individuals accumulatively endured distress and anxiety about what was going to happen and what was going to come, and where would I be that I know you have endured [on] your own behalf, but multiply that similar kind, not of imprisonment, but of expulsion of being left homeless. So while I sympathize and understand with the distress that you've -- the anxiety that you felt and the uncertainty that you felt, I think it's been a fraction of what you caused others from whom you stole day in and day out, check by check by check, for a period of years, but a fraction. The distress and the toll that you caused because of your very deliberate continuing, almost unremitting and unrelenting crimes, trying to think of an apt analogy to express how deeply reprehensible or how deeply I feel the moral reprehensibility of that. In my view it's like somebody walking along a sidewalk and sees a few nickels in a blind beggar's cup and steals them from the blind beggar and walks down the street, spends it on whatever he wants to, same level of abject indifference and immorality that in my view is incomprehensible and ultimately, try as I have, I have been

unable, I think and I fear to describe how horrible it was. And therefore, I think a substantial upward variance is justified.

(R. 112, Keating Sent. Tr., PageID # 4004–07.)

Rather than being premised on Keating's leadership role in the operation, the court appeared to place much greater emphasis on how "reprehensible," "unnecessary," and "devastating" Keating's offenses were, on "the cumulative effect upon literally hundreds of people," and on the "incomprehensible" "abject indifference and immorality" reflected by Keating's crimes. (R. 112, Keating Sent. Tr., PageID # 4004–07.) The district court explicitly couched its considerations in an analysis of the 18 U.S.C. § 3553(a) factors. Although these same facts may have also supported an enhancement under the Guidelines, that does not preclude the district court from considering them in assessing the "nature and circumstances of the offense" or the "history and characteristics" of the defendant. *See United States v. Rodriguez*, 628 F.3d 1258, 1264 (11th Cir. 2010) ("[A] district court can rely on factors in imposing a variance that it had already considered in imposing an enhancement . . . and there is no requirement that the district court must impose an enhancement before granting a variance." (citation omitted)). Accordingly, we find no plain error in the district court's decision to vary upward.

Keating next argues that his sentence is substantively unreasonable for the same reasons given above: namely, that the district court improperly relied on his position as the "defacto leader" of the operation. (Brief for Keating at 15–16.) As articulated above, the district court did not rely on an impermissible factor, but instead gave a thorough analysis of the relevant § 3553(a) factors to explain why an upward variance was necessary. The court properly weighed Keating's role in the criminal enterprise along with numerous other factors in reaching its sentence. Therefore, Keating has failed to demonstrate that his sentence was procedurally or substantively unreasonable.

**CONCLUSION**

For the reasons set forth above, we **AFFIRM** the district court's sentencing decisions.